## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TSAWD HOLDINGS, INC., *et al.*,[1]<br><br>          Debtors. | Chapter 11<br><br>Case No. 16-10527 (MFW)<br><br>(Jointly Administered) |
| TSA STORES, INC., TSA PONCE, INC., and<br>TSA CARIBE, INC.,<br>      Plaintiffs,<br>and WILMINGTON SAVINGS FUND<br>SOCIETY, FSB, AS SUCCESSOR<br>ADMINISTRATIVE AND COLLATERAL<br>AGENT,<br>      Plaintiff-Intervenor/<br>      Counterclaim Defendant,<br>      v.<br>PERFORMANCE APPAREL CORP. a/k/a HOT<br>CHILLYS, INC.,<br>      Defendant/Counterclaim<br>      Plaintiff. | Adv. Pro. No. 16-50317-MFW |

## MEMORANDUM OF LAW IN SUPPORT OF
## TERM LOAN AGENT'S MOTION FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Daniel B. Butz (No. 4227)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302-658-9200

*Counsel to Wilmington Savings*
*Fund Society, FSB, as Term Loan Agent*

BROWN RUDNICK LLP
Robert J. Stark (admitted *pro hac vice*)
William R. Baldiga (admitted *pro hac vice*)
May Orenstein (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: TSAWD Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); TSAWD, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

The Debtors were formerly known as: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................... ii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING ............... 1

SUMMARY OF ARGUMENT ...................................................... 1

STATEMENT OF FACTS ........................................................ 2

I.    The Term Loan Agent Receives And Perfects A Lien On And
      Security Interest In Collateral, Including Inventory. ............................. 2

II.   PAC Enters Into A Consignment Relationship With TSA, Perfects Its Purchase-Money
      Security Interest In 2009, And Allows Its Perfection To Lapse. ........................... 3

III.  The Term Loan Agent's Lack of Knowledge ......................... 5

IV.   The Bankruptcy Cases. ....................................... 7

V.    The Term Loan Agent Moves For Judgment On The Pleadings. ......................... 8

ARGUMENT .................................................. 10

I.    Applicable Legal Standard................................... 10

II.   Summary Judgment Should Be Granted In Favor Of The Term Loan Agent
      Because The Term Loan Agent Has A Senior Interest In The Disputed Proceeds. ............. 10

      A.   The Requirements For An Enforceable Interest In Collateral Are
           Satisfied With Respect To The Prepetition Consigned Goods. ....................... 11

           1.   Value Has Been Given................................. 11

           2.   The Debtors Had The Power To Transfer
                Rights In The Collateral To The Term Loan Lenders. .................. 12

           3.   The Debtors Authenticated A Security
                Agreement That Provides A Description Of The Collateral........................ 12

      B.   Under The UCC, The Term Loan Agent's Perfected Interest In The
           Prepetition Consigned Goods Is Senior To PAC's Unperfected Interest. ....................... 14

      C.   The Competing Interests Of The Term Loan Agent And PAC In The
           Prepetition Consigned Goods Are Governed By Article 9 Of The UCC. ........................ 16

1.  The Discovery Record Provides No
Support For PAC's General Knowledge Defense. ...................................................... 16

2.  The Discovery Record Provides No
Support For PAC's Actual Knowledge Defense. ......................................................... 19

III.  Summary Judgment Should Be Granted In Favor Of The Term Loan
Agent On Count II Of The Term Loan Agent's Complaint Because
The Term Loan Agent Is Entitled To The Remedy Of Disgorgement. ............................... 22

CONCLUSION ....................................................................................................................... 22

## <u>TABLE OF AUTHORITIES</u>

<u>Page</u>

<u>Cases</u>

Anderson v. Liberty Lobby, Inc.,
    477 U.S. 242 (1986) ..................................................................................................10

ATG Aerospace Ltd. v. High–Line Aviation, Ltd. (In the Matter of High–Line
    Aviation, Inc.),
    149 B.R. 730 (Bankr. N.D. Ga. 1992) ....................................................................17

Berk v. State Bank of India,
    No. 96 CIV. 4972(MBM), 1998 WL 567853 (S.D.N.Y. Aug. 28, 1998) ...............21

In re BRI Corp.,
    88 B.R. 71 (Bankr. E.D. Pa. 1988) ..........................................................................17

Burton v. Teleflex Inc.,
    707 F.3d 417 (3d Cir. 2013) ....................................................................................10

Eurpac Serv. Inc. v. Republic Acceptance Corp.,
    37 P.3d 447 (Colo. App. 2000) .................................................................19, 20, 21

Galli v. N.J. Meadowlands Comm'n,
    490 F.3d 265 (3d Cir. 2007) ....................................................................................10

GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.,
    474 F. Supp. 1357 (W.D. Pa. 1979), aff'd sub nom. A. J. Armstrong Co., Inc.,
    Appeal of, 622 F.2d 578 (3d Cir. 1980) ..............................................................19, 20

Home-Stake Oil & Gas Co. v. Home-Stake Acquisition Corp.,
    No. 99-5005, 2000 WL 216612 (10th Cir. Feb. 23, 2000) ......................................11

JoJo's 10 Restaurant, LLC v. Devin Props., LLC (In re Jojo's 10 Restaurant,
    LLC),
    455 B.R. 321 (Bankr. D. Mass. 2011) ................................................................11, 12

Leverett Co. v. Arthur A. Everts Co. (In re Arthur A. Everts Co.),
    35 B.R. 706 (Bankr. N.D. Tex. 1984) .....................................................................17

Multibank Nat'l of W. Mass., N.A. v. State St. Auto Sales, Inc. (In re State St.
    Auto Sales, Inc.),
    81 B.R. 215 (Bankr. D. Mass. 1988) ..................................................................17, 18

In re Russell,
    254 B.R. 138 (Bankr. W.D. Va. 2000) ................................................................12, 13

*In re SemCrude, L.P.,*
    504 B.R. 39 (Bankr. Del. 2013) ....................................................................19, 20

*Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper–Richman Furs),*
    147 B.R. 140 (Bankr. N.D. Ill. 1992) .......................................................................17

*TSA Stores, Inc. v. M J Soffe, LLC (In re TSAWD Holdings, Inc.),*
    565 B.R. 292 (Bankr. D. Del. 2017) ...............................................9, 12, 13, 14, 16

*Uniroyal, Inc. v. Universal Tire & Auto Supply Co.,*
    557 F.2d 22 (1st Cir. 1977) .......................................................................................22

*In re Valley Media, Inc.,*
    279 B.R. 105 (Bankr. D. Del. 2002). .................................................................17, 18

*In re WL Homes, LLC,*
    452 B.R. 138 (Bankr. D. Del. 2011) .........................................................................11

*Woven Treasures, Inc. v. Hudson Capital, LLC,*
    46 So. 3d 905 (Ala. 2009) .........................................................................................13

**Statutes**

Colo. Rev. Stat. § 4-9-101, *et seq.* .....................................................................................5

Del. Code Ann. tit. 6, § 1-204 ...........................................................................................11

Del. Code Ann. tit. 6, § 9-101, *et seq.* ...............................................................................5

Del. Code Ann. tit. 6, § 9-102 ................................................................................. *passim*

Del. Code Ann. tit. 6, § 9-103 ...........................................................................................14

Del. Code Ann. tit. 6, § 1-202 ...........................................................................................21

Del. Code Ann. tit. 6, § 9-203 ...........................................................................................11

Del. Code Ann. tit. 6, § 9-310 ...........................................................................................14

Del. Code Ann. tit. 6, § 9-317 ...........................................................................................15

Del. Code Ann. tit. 6, § 9-319 ...........................................................................................12

Del. Code Ann. tit. 6, § 9-322 ...........................................................................................15

Del. Code Ann. tit. 6, § 9-324 .....................................................................................15, 21

Del. Code Ann. tit. 6, § 9-515 ...........................................................................................21

UCC § 9-319 .................................................................................................................................8

UCC § 9-324 .................................................................................................................................8

**Other Authorities**

Fed. R. Bankr. P. 7056 ...............................................................................................................10

Fed. R. Civ. P. 56 .......................................................................................................................10

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

1.      Intervenor/Counterclaim-Plaintiff Wilmington Savings Fund Society, FSB, as successor administrative and collateral agent (the "Term Loan Agent") under that certain Amended and Restated Credit Agreement, dated as of November 16, 2010 (the "Term Loan Credit Agreement"), by and among The Sports Authority, Inc., as the Borrower, Slap Shot Holdings Corp., as Holdings, Wilmington Savings Fund Society, FSB, as successor Administrative Agent and Collateral Agent to Bank of America, N.A, and the lenders from time to time party thereto (the "Term Loan Lenders"), hereby respectfully submits this memorandum of law in support of its motion against Defendant/Counterclaim-Plaintiff Performance Apparel Corp. a/k/a Hot Chillys, Inc. ("PAC") for summary judgment (the "Motion").  The Term Loan Agent seeks summary judgment in favor of the Term Loan Agent on the Term Loan Agent's Complaint [D.I. 13] and PAC's Counterclaims [D.I. 14].

## SUMMARY OF ARGUMENT

2.      On March 2, 2016, the day TSA Stores, Inc. ("TSA") and the other Debtors filed for bankruptcy, the Term Loan Agent held a perfected lien on all of the inventory of TSA.  PAC, a consignment vendor, had allowed its 2009 UCC-1 filing to lapse, failed to re-file, and failed to provide a re-notice to the Term Loan Agent of PAC's continuing consignments to TSA.  Under the UCC, the Term Loan Agent's perfected security interest in inventory has priority over PAC's unperfected interest in that inventory.  On May 3, 2016, the Court entered an order providing that to the extent that the Term Loan Agent is adjudicated to have a security interest in goods consigned to TSA senior to the interests of a consigner, the proceeds of the sale of those goods belong to the Term Loan Agent.  See *Final Order Authorizing the Debtors to Sell Prepetition Consigned Goods*, In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D.

Del. May 3, 2016) [D.I. 1704] (the "<u>Final Order</u>").    Accordingly, the Term Loan Agent is entitled to summary judgment.

3.    Notwithstanding the absence of any issue of either fact or law, PAC has persisted in a wasteful litigation based on the unsupportable contention that by complying with UCC filing and notification requirements in 2009, it achieved a senior interest in the proceeds of the sale of PAC products in perpetuity.    This contention, of course, is wrong.    The UCC provides that a filing lapses after five years and notification must be given within five years before the debtor receives possession of the inventory.    That PAC once protected its rights does not entitle PAC to special treatment.

4.    It is time to end this protracted litigation by recognition of the Term Loan Agent's right to the proceeds of the pre-petition consigned goods.

## <u>STATEMENT OF FACTS</u>

**I.    The Term Loan Agent Receives And Perfects A Lien On And Security Interest In Collateral, Including Inventory.**

5.    The Debtors were engaged in the marketing and sale of sporting goods and active apparel to the general public from numerous retail stores across the U.S. and Puerto Rico.    In 2006, the Debtors entered into a secured financing facility that included a term loan which, following a refinancing in November 2010, amounted to $300 million (the "<u>Term Loan</u>").    <u>See</u> Ex. A.[2]    As of the Petition Date, approximately $276.7 million, exclusive of accrued and unpaid interest, fees and other obligations, was outstanding under the Term Loan Credit Agreement. <u>See</u> *Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief*, dated March 2, 2016 [D.I. No. 22], ¶ 27.

---

[2]    Citations to "Ex." refer to exhibits attached to the Declaration of May Orenstein in Support of Term Loan Agent's Motion for Summary Judgment, filed contemporaneously herewith.

6.      The Term Loan is secured, pursuant to the terms of the Term Loan Security Agreement, by a lien in favor of the Term Loan Agent on "Collateral," including inventory. "Collateral" is defined to include "all personal property of each Grantor, including, without limitation, . . . Inventory . . . [and] any of the foregoing, whether now owned or now due, or in which any Grantor has an interest, or hereafter acquired, arising, or to become due, or in which any Grantor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing . . . ." Ex. B §§ 2.01, 1.02.[3]

7.      The term "Inventory" is defined to have the meaning given to that term in the UCC and also, specifically, to "include, without limitation, all Goods *which are held* by a Person for sale . . . ." Id. § 1.02.  The UCC defines "inventory," in relevant part, as "goods . . . which . . . are held by a person for sale . . . ."  Del. Code Ann. tit. 6, § 9-102(a)(48).  The term "Proceeds" is defined by reference to UCC § 9-102(a)(64) to include "whatever is acquired upon the sale . . . or other disposition of collateral."  Ex. B § 1.02; Del. Code Ann. tit. 6, § 9-102(a)(64).

8.      The Term Loan Agent (or its predecessor) perfected its security interest in, *inter alia*, all of the inventory of the Debtors by filing UCC-1 financing statements in 2006 and, thereafter, continuation statements.  See Exs. C-F.  The collateral description contained in the financing statements reads: "All assets of the Debtor, whether now owned or hereafter acquired, including all products, proceeds, substitutions and accessions of or to any of the foregoing."  Id.

## II.    PAC Enters Into A Consignment Relationship With TSA, Perfects Its Purchase-Money Security Interest In 2009, And Allows Its Perfection To Lapse.

9.      As part of its business, the Debtors developed a pay-by-scan program for the sale of goods on consignment.  Sports Authority's main suppliers, such as Nike, did not participate in

---

[3]     The Security Agreement, dated as of May 3, 2006, by and among (a) The Sports Authority, Inc., a Delaware corporation, as borrower, (b) each of the guarantors listed on Schedule I thereto, and (c) Wilmington Savings Fund Society, FSB, as successor collateral agent to Bank of America, N.A (the "Term Loan Security Agreement").

the pay-by-scan program. See Ex. G at 39:9-40:13. Historically, the program was a minor part of the Debtors' business. See id. at 37:12-25, 42:15-43:3; Ex. H at Response No. 1. As of the Petition Date, only a small percentage of the Debtors' inventory was held on consignment. In fiscal year 2015, consigned goods represented approximately 11% of the debtors' inventory and approximately 9% of revenue. See id. 89:14-17, 93:22-94:12. Those percentages were likely lower in the years prior to 2015. See id. 91:9-12. During these chapter 11 cases, the Debtors stipulated that as of the Petition Date, "*no more than* approximately 14% of the inventory of the Debtors was available for sale on consignment . . . ." See *Stipulation of Fact Between Wilmington Savings Fund, FSB, as Term Loan Agent and Debtors*, In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) [D.I. 1400] (emphasis added). This percentage may not have exceeded 11%. See id. 96:22-97:15.

10.    To participate in the pay-by-scan program, a vendor would enter into a "pay by scan" deal sheet summary specifying whether the vendor would be paid on a cost or retail split basis. The Debtors would pay the consignment vendor either an agreed-upon amount for each item sold or an agreed-upon percentage of the retail sale price. The Debtors would retain the remaining proceeds, if any, from the sale.

11.    PAC has had a consignment arrangement with the Debtors since 2009. See Ex. H at Response No. 18. The deal sheets operative at the Petition Date were executed on or around August 2015. See Exs. I-J (the "PBS Agreements"). One deal sheet concerned socks supplied by PAC on a retail split basis. See Ex. I (the "PBS Agreement I"). A second deal sheet concerned base layer products supplied by PAC on a cost basis. See Ex. J (the "PBS Agreement II").

12.    Pursuant to the PBS Agreements, PAC agreed that the arrangement between it and TSA was "a consignment as defined in Section 9-102 of the Colorado and Delaware Uniform Commercial Codes." See Exs. I-J.[4] The PBS Agreements also "entitled [PAC] to file UCC-1 Financing Statements to reflect this consignment." Id.

13.    PAC filed a UCC-1 financing statement in Pennsylvania on or about August 28, 2009. See Ex. K. The financing statement references the attached Exhibit A for a description of the collateral. Exhibit A lists twenty-two products by their style numbers and names, all of which appear to be "base layers," an apparel item worn for cold weather sports. See id. PAC mailed a notice, dated August 26, 2009, of its UCC filing to Bank of America. See Ex. L. That notice referenced UCC § 9-324(b) and explained that PAC "will be consigning certain performance base layer garments to TSA Stores, Inc." and "will be filing UCC-1 Financing Statements to confirm its consignment interest in such goods . . . ." Id. When the Term Loan was refinanced in 2010, PAC was identified in a schedule of "[l]iens existing on the date hereof" attached to the Term Loan Credit Agreement as Schedule 7.01(b). See Ex A at TLA00001170-1178.

14.    Following this August 2009 filing, PAC did not file any continuation statements or additional UCC-1 financing statements.

**III.    The Term Loan Agent's Lack of Knowledge**

15.    There is no evidence that either of the two entities that served as Term Loan Agent had any knowledge regarding PAC's consignment arrangement with the Debtors. See, e.g., Ex. M at 62:13-63:11, 66:22-68:6 ((testimony of WSFS 30(b)(6) witness, Pat Healy (who

---

[4]    The applicable provisions of the UCC discussed herein are the same as enacted in Colorado and Delaware. Citations to the "UCC" herein refer to the UCC as enacted in Colorado (Colo. Rev. Stat. § 4-9-101, et seq.) and Delaware (Del. Code Ann. tit. 6, § 9-101, et seq.).

had primary responsibility for the Term Loan Agent relationship), regarding the lack of any pre-petition communications with WSFS regarding the Debtors' consignment program generally and PAC's consignment relationship with the Debtors specifically); Ex. H at Response Nos. 27, 38-39, 41, 46-47, 49 (Debtors describing their lack of communication with Bank of America and WSFS regarding their consignment program generally and PAC's consignment relationship with the Debtors specifically).

16.     Further, pursuant to the Term Loan Security Agreement, the Debtors represented and warranted that no borrower or guarantor possessed any property on consignment, except for inventory on consignment representing an immaterial portion of total inventory for sale.  The Debtors also covenanted that they would not, in the future, acquire material amounts of inventory on consignment.  See Ex. B § 3.06; Schedule 3.06 ("Except [for an immaterial portion of total inventory for sale], no Grantor has, and none shall have, possession of any property on consignment.").  After entry into the Term Loan Credit Agreement, the Debtors certified on a quarterly basis to the Term Loan Agent that they were in compliance with each covenant and condition under the Term Loan documents, including the Term Loan Security Agreement's covenant not to hold a material portion of inventory on consignment.  See, e.g., Ex. N at TLA00000460.  The Term Loan Agent never received any contradictory information regarding the amount of goods held by TSA on consignment.

17.     In addition, under the Term Loan Credit Agreement, the Debtors were required to provide the Term Loan Agent with balance sheets and budgets.  See Ex. A § 6.01(a).  The Debtors were also required to deliver certain additional information, such as statements identifying all owned and leased property and a report summarizing insurance coverage.  See id.

§ 6.01(b). None of these statements included information on the Debtors' consignment or "pay by scan" programs. See id. § 6.01.

## IV.    **The Bankruptcy Cases.**

18.    On March 2, 2016, the Debtors commenced their chapter 11 cases and, among motions seeking so-called "first day relief," sought interim and final orders authorizing them to continue selling, *inter alia*, goods supplied under the pay-by-scan program prior to the Petition Date.[5] On March 11, 2016 and April 5, 2016, the Court issued interim orders on the Consigned Goods Motion, authorizing the Debtors to, *inter alia*, sell the consigned goods and remit the portion of the proceeds of the consigned goods allocable to consigning vendors pursuant to the terms of the applicable consignment agreement between the Debtors and such parties.[6]

19.    On May 3, 2016, the Court entered the Final Order on the Consigned Goods Motion. Pursuant to the Final Order, if and to the extent the Term Loan Agent is adjudicated to have a security interest in goods consigned pre-Petition senior to any interest in such goods held by a consigning vendor, that security interest attaches to the proceeds from the sale of those goods. See Final Order ¶ 8. Moreover, the Final Order provides that these proceeds, together

---

[5]    See *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Sell Consigned Goods in the Ordinary Course of Business Free and Clear of All Liens, Claims and Encumbrances and (II) Grant Administrative Expense Priority to Consignment Vendors for Consigned Goods Delivered Postpetition; and (B) Grant Replacement Liens to Consignment Vendors with Perfected Security Interests in Consigned Goods and/or Remit the Consignment Sale Price Arising from Sale of Consigned Goods to Putative Consignment Vendors*, In re Sports Authority Holdings, Inc., Case No. 16-10527(MFW) (Bankr. D. Del. Mar. 2, 2016) [D.I. 9] (the "Consigned Goods Motion").

[6]    See *Interim Order (A) Authorizing the Debtors to (I) Continue to Sell Consigned Goods in the Ordinary Course of Business Free and Clear of All Liens, Claims, Encumbrances, and Interests; and (II) Grant Administrative Expense Priority and Purchase Money Security Interests to Consignment Vendors for Consigned Goods Delivered Postpetition; and (B) Grant Replacement Liens to Consignment Vendors with Security Interests and/or Holding Title or Ownership Rights in Consigned Goods and/or Remit the Consignment Sale Price Arising from Sale of Consigned Goods to Putative Consignment Vendors*, In re Sports Authority Holdings, Inc., Case No. 16-10527(MFW) (Bankr. D. Del. Mar. 11, 2016) [D.I. 278]; *Order*, In re Sports Authority Holdings, Inc., Case No. 16-10527(MFW) (Bankr. D. Del. Mar. 11, 2016) [D.I. 289]; *Supplemental Interim Order Authorizing the Debtors to Continue to Sell Certain Prepetition Consigned Goods*, In re Sports Authority Holdings, Inc., Case No. 16-10527(MFW) (Bankr. D. Del. Apr. 5, 2016) [D.I. 1044].

with interest thereon, are subject to disgorgement by the consigning vendor in favor of the Term Loan Agent.  See id.

20.    Pursuant to these orders, the Debtors sold goods supplied by PAC prior to the Petition Date (the "Prepetition Consigned Goods").  See Ex. O, Declaration of Douglas Garrett sworn to on May 11, 2018.   $243,485.37 represents the proceeds remitted to PAC for the post-Petition sale of goods supplied by PAC to the Debtors pre-Petition.  See id.

## V.    The Term Loan Agent Moves For Judgment On The Pleadings.

21.    The Term Loan Agent moved for judgment on the pleadings on July 19, 2016 based on the perfected security interest granted under the Term Loan Security Agreement which, under UCC §§ 9-324(b) and 9-319(a), had priority over an unperfected purchase money security interest in inventory afforded to an Article 9 consignor that supplies goods to a merchant for resale.  The Term Loan Agent argued that judgment on the pleadings was appropriate because PAC had agreed, pursuant to the PBS Agreements, that its arrangement with the Debtors "shall qualify as a consignment under section 9-102(a)(20)" and was accordingly estopped from maintaining that the arrangement was not an Article 9 consignment.

22.    PAC opposed on, *inter alia*, the following grounds:

   a.    That the security interests granted under the Term Loan Security Agreement did not extend to the Prepetition Consigned Goods, relying on In re Salander-O'Reilly Galleries, LLC, 2014 WL 7389901 (S.D.N.Y. 2014).

   b.    That the Term Loan Agent's knowledge of PAC's consignment transactions defeated the Term Loan Agent's claims.

   c.    That the adversary proceeding should be dismissed by the Debtors and removed to state court.

        d.    That PAC's pay-by-scan agreement with the Debtors terminated pre-petition.[7]

23.    The Court rejected the Term Loan Agent's contention that the provision in the pay by scan deal sheet providing that the "arrangement shall qualify as a consignment under section 9-102(a)(20)" of the UCC estopped PAC from arguing that the arrangement was not governed by the UCC.  See Memorandum Opinion, dated Mar. 7, 2017 [D.I. 37], 5-10.  The Court denied judgment on the pleadings, holding that there were disputed issues of fact concerning whether the arrangement PAC had with the Debtors satisfied the UCC definition of a consignment.  Specifically, the Court could not determine from the pleadings "whether the majority of the Debtors' creditors knew the Debtors were selling goods on consignment and whether the Debtors were substantially engage in selling consigned goods," or "whether WSFS had actual knowledge of the consignment arrangement under the Agreement between the Debtors and [PAC]."  See id. at 12, 15.

24.    The Court also considered the three requirements for a security interest to attach to collateral under UCC § 9-203 and concluded that (i) PAC conceded value was given; (ii) the requirement that the debtor have rights in, or the power to transfer rights in, collateral was satisfied by the legal fiction of UCC § 9-319; and (iii) the sufficiency of the collateral description in the Security Agreement could not be resolved on the pleadings.  See id. 16-18.[8]  In addition, the Court ruled that it had subject matter jurisdiction over this adversary proceeding and, given

---

[7]    Among the grounds upon which the Court denied the Term Loan Agent's motion for judgment on the pleadings was identification of PAC's claimed pre-petition termination of its PBS Agreements.  See Memorandum Opinion, dated Mar. 7, 2017 [D.I. 37] at 20.  PAC has since abandoned that contention.

[8]    In a case involving a different vendor that participated in the TSA pay-by-scan program, the Court rejected PAC's argument based on In re Salander, noting that that decision did not address the central issue of whether the consignment there in question was governed by the UCC.  See TSA Stores, Inc. v. M J Soffe, LLC (In re TSAWD Holdings, Inc.), 565 B.R. 292, 304 (Bankr. D. Del. 2017).

PAC's consent, could enter final orders.  See *Memorandum Opinion*, dated Mar. 7, 2017 [D.I. 37], 4.

## ARGUMENT

### I.      Applicable Legal Standard.

25.     Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Fed. R. Bankr. P. 7056.

26.     Once the moving party establishes that there is no genuine dispute as to any material fact, the burden shifts to the non-moving party to identify "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).  To avoid the entry of summary judgment, the non-moving party cannot rest upon allegations in the pleadings and "must show specific facts such that a reasonable jury could find in that party's favor, thereby establishing a genuine issue of fact for trial." Galli v. N.J. Meadowlands Comm'n, 490 F.3d 265, 270 (3d Cir. 2007); Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013) ("To establish a prima facie case at summary judgment, 'the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case.'") (quoting Duffy v. Paper Magic Grp., 265 F.3d 163, 167 (3d Cir.2001)).

### II.     Summary Judgment Should Be Granted In Favor Of The Term Loan Agent Because The Term Loan Agent Has A Senior Interest In The Disputed Proceeds.

27.     The Term Loan Agent is entitled to summary judgment in this case because it is beyond reasonable dispute that (i) each of the requirements for the creation of an enforceable security interest in the Prepetition Consigned Goods are satisfied; (ii) the Term Loan Agent perfected that security interest, whereas PAC's interest is unperfected; and (iii) there is no

evidence that TSA was "substantially engaged" in the sale of goods on consignment or that the Term Loan Agent had any knowledge that PAC supplied goods to TSA on consignment.

### A.    The Requirements For An Enforceable Interest In Collateral Are Satisfied With Respect To The Prepetition Consigned Goods.

28.    Under UCC § 9-203, a security interest is enforceable with respect to collateral if "(1) value has been given; (2) the debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) . . . (A) the debtor has authenticated a security agreement that provides a description of the collateral . . . ."  Del. Code Ann. tit. 6, § 9-203(b). Each of these requirements has been fulfilled here.

### 1.    Value Has Been Given.

29.    "[A] person gives value for rights if the person acquires them: (1) in return for a binding commitment to extend credit or for the extension of immediately available credit . . . or (4) in return for any consideration sufficient to support a simple contract."  Del. Code Ann. tit. 6, § 1-204; see also Home-Stake Oil & Gas Co. v. Home-Stake Acquisition Corp., No. 99-5005, 2000 WL 216612, at *3 (10th Cir. Feb. 23, 2000).  PAC previously conceded this point, see Memorandum Opinion, dated Mar. 7, 2017 [D.I. 37], 16, and for good reason.

30.    In exchange for various covenants and promises of TSA and the grant to the Term Loan Agent of a security interest in collateral, the Term Loan Lenders provided TSA with $300 million.  The Term Loan Lenders' loan to the Debtors satisfies the value prerequisite to the enforceability of the Term Loan Agent's security interest.  See In re WL Homes, LLC, 452 B.R. 138, 144 (Bankr. D. Del. 2011) ("It is well established that the extension of credit constitutes value [in satisfaction of requirement under UCC § 9-203].");  JoJo's 10 Restaurant, LLC v. Devin Props., LLC (In re Jojo's 10 Restaurant, LLC), 455 B.R. 321, 326 (Bankr. D. Mass. 2011)

("There is no dispute that by loaning money to the debtor, [the secured party] gave value to the debtor . . . .").

31.     Section 9-203(b) does not require that "value is given" for particular items of collateral.  See In re Russell, 254 B.R. 138, 144 (Bankr. W.D. Va. 2000) (rejecting argument that giving value means financing the purchase of inventory, "[i]t being clear that the Bank made a substantial loan to the [merchants] when it obtained the security interest, its rights were established at that time, even against inventory subsequently acquired and made possible by the funds of others").

### 2.     The Debtors Had The Power To Transfer Rights In The Collateral To The Term Loan Lenders.

32.     As this Court has already determined, the Debtors had the power to grant a security interest in goods consigned to them for resale even though the Debtors did not own the consigned goods as a matter of non-UCC law.  See *Memorandum Opinion* at 17 ("Thus, the Court concludes that section 9-203(b)(2) is satisfied by the fiction of section 9-319(a) and the Debtors had the power to grant a security interest in the consigned goods to WSFS."); see also Del. Code Ann. tit. 6, § 9-319(a) ("[F]or purposes of determining the rights of a creditor of . . . a consignee, while the goods are in the possession of the consignee, the consignee is deemed to have rights and title to the goods identical to those the consignor had or had power to transfer.").

### 3.     The Debtors Authenticated A Security Agreement That Provides A Description Of The Collateral.

33.      "Authenticate" means "to sign."  Del. Code Ann. tit. 6, § 9-102(a)(7)(A).  The borrowers and guarantors signed the Term Loan Security Agreement, fulfilling the authentication requirement for granting an enforceable security interest.  See Ex. B.

34.     In addition, as this Court has already ruled in a related action involving another consignment vendor, a description of the collateral was provided.  See In re In re TSAWD

Holdings, Inc., 565 B.R. at 302-04.  The "Collateral," as described under the Term Loan Security Agreement, includes "all personal property of each Grantor, including, without limitation, . . . Inventory . . . [and] any of the foregoing, whether now owned or now due, or in which any Grantor has an interest, or hereafter acquired, arising, or to become due, or in which any Grantor obtains an interest, and all products, Proceeds, substitutions, and Accessions of or to any of the foregoing . . . ."  Ex. B §§ 2.01, 1.02.  The term "Inventory" is defined to have the meaning given to that term in the UCC, "and shall also include, without limitation, all Goods *which are held* by a Person for sale . . . ."  Id. § 1.02.  The UCC further defines "inventory," in relevant part, as "goods . . . which . . . are held by a person for sale . . . ."  Del. Code Ann. tit. 6, § 9-102(a)(48). The term "Proceeds" is defined by reference to UCC § 9-102(a)(64) to include "whatever is acquired upon the sale . . . or other disposition of collateral."  Ex. B § 1.02; Del. Code Ann. tit. 6, § 9-102(a)(64).

35.    This provides a sufficient description of the collateral, inclusive of consigned goods.  See In re TSAWD Holdings, Inc., 565 B.R. at 304 (rejecting the argument that this description cannot encompass consigned goods); Woven Treasures, Inc. v. Hudson Capital, LLC, 46 So. 3d 905, 915 (Ala. 2009) (holding that the description of collateral as "all of Merchant's owned retail inventory" included goods held on consignment); In re Russell, 254 B.R. 138, 141-43 (Bankr. W.D. Va. 2000) (holding that the description of collateral as "all debtors' . . . inventory, . . . whether now owned or hereafter acquired" included goods held on consignment).

36.    As noted *supra* n.8, this Court has rejected arguments based on In re Salander–O'Reilly Galleries, LLC that there was no intent to grant the Term Loan Agent a security interest in consigned goods under the Term Loan Security Agreement − noting that the case is

unpersuasive because it did not address whether the consignment arrangement was governed by the UCC. <u>See</u> <u>In re TSAWD Holdings, Inc.</u>, 565 B.R. at 304.

37.    In addition, the Term Loan Agent's collateral is further described in its UCC-1 financing statements as "[a]ll assets of the Debtor, whether now owned or hereafter acquired, including all products, proceeds, substitutions and accessions of or to any of the foregoing." Exs. C-F. This description "is sufficiently broad to provide inquiry notice of WSFS's possible security interest" in consigned goods. <u>In re TSAWD Holdings, Inc.</u>, 565 B.R. at 302.

38.    Accordingly, the requirement for an authenticated security agreement that provides a description of the collateral is satisfied by the Term Loan Security Agreement.

**B.    Under The UCC, The Term Loan Agent's Perfected Interest In The Prepetition Consigned Goods Is Senior To PAC's Unperfected Interest.**

39.    As described in the prior section, the Term Loan Agent had an enforceable security interest in the Prepetition Consigned Goods. The Term Loan Agent filed a UCC-1 financing statement with regard to its collateral under the Term Loan Security Agreement in 2006 and filed continuation statements thereafter, properly perfecting its security interest. <u>See</u> Del. Code Ann. tit. 6, § 9-310(a) (providing that a "financing statement must be filed to perfect all security interests").

40.    Competing against the Term Loan Agent's perfected interest in the Prepetition Consigned Goods is PAC's interest as a consignor in the Prepetition Consigned Goods. Under the UCC, this interest qualifies as a purchase money security interest ("<u>PMSI</u>"). <u>See</u> Del. Code Ann. tit. 6, § 9-103(d) ("[T]he security interest of a consignor in goods that are the subject of a consignment is a purchase-money security interest in inventory."). PAC filed a UCC-1 financing statement in 2009 but thereafter failed to file continuation statements or any additional UCC-1 financing statements. As the Court recognized:

> A consignor is perfected for five years from the filing of its UCC-1 financing statement. Del. Code Ann. tit. 6, § 9-515(a).  Prior to the end of the five-year period, a consignor must file a continuation statement within six months in order to remain perfected.  Id. § 9-515(c), (d).  Failure to remain continuously perfected results in a consignor being relegated to general unsecured creditor status.  Id. § 9-515(c).

*Memorandum Opinion*, dated Mar. 7, 2017 [D.I. 37], 19-20.  Accordingly, beginning in August 2014 and at all times thereafter, PAC was "relegated to general unsecured creditor status."

41.     Under the general UCC rules applicable to competing security interests, the Term Loan Agent's perfected security interest has priority over interests, like PAC's, that are unperfected.  <u>See</u> Del. Code Ann. tit. 6, § 9-317(a)(1) (providing that a security interest is subordinate to the rights of a security interest that is entitled to priority under UCC § 322); Del. Code Ann. tit. 6, § 9-322(a) (providing that a perfected security interest has priority over a conflicting unperfected security interest in the same collateral and proceeds thereof).

42.     The UCC does contain an exception to these general priority rules that provides consignors, like PAC, the opportunity to obtain senior rights in consigned goods over a prior-perfected secured lender.  Pursuant to UCC § 9-324(b), a perfected PMSI has priority over a conflicting security interest in the same inventory if the following requirements are met:

> (1) the consignee perfects its PMSI before the debtor receives possession of the inventory;
>
> (2) the consignee sends an authenticated notification to the holder of the conflicting security interest that states that the consignee has or expects to acquire a PMSI in inventory of the debtor and describes the inventory; *and*
>
> (3) the holder of the conflicting security interest receives the notification within five years before the debtor receives possession of the inventory.

Del. Code Ann. tit. 6, § 9-324(b).  PAC did not meet these requirements with respect to the Prepetition Consigned Goods because its 2009 UCC-1 filing had lapsed as of August 2014 and accordingly PAC's PMSI with respect to goods supplied after August 2014 was unperfected.

Further, its 2009 notification was no longer timely as it preceded the Debtors' possession of the Prepetition Consigned Goods by more than five years.

43.     Based on the fully-developed record in this case, there can be no genuine dispute as to facts that compel the conclusion that the UCC governs the conflicting interests of the Term Loan Agent and PAC in the Prepetition Consigned Goods and Disputed Proceeds.  See infra Section II.C.  As a result, by application of the UCC, the Term Loan Agent is entitled to summary judgment with respect to its Complaint and PAC's Counterclaims.

### C.     The Competing Interests Of The Term Loan Agent And PAC In The Prepetition Consigned Goods Are Governed By Article 9 Of The UCC.

44.     The rights of an unperfected consignor like PAC will be given priority over the rights of a secured creditor who has perfected only "if it can prove, by a preponderance of the evidence, that the transaction is not governed by Article 9 because the consignment does not fit the UCC definition."  In re TSAWD Holdings, Inc., 565 B.R. at 299.  PAC has raised two meritless defenses to the application of the UCC.  It is clear that PAC cannot meet its burden to prove either of these defenses.

### 1.     The Discovery Record Provides No Support For PAC's General Knowledge Defense.

45.     "Consignment" is defined under the UCC as "a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale" and that meets certain additional requirements.   Del. Code Ann. tit. 6, § 9-102(a)(20)(A).   These additional requirements include that:

(A) the merchant:

(i) deals in goods of that kind under a name other than the name of the person making delivery;

(ii) is not an auctioneer; and

(iii) is not generally known by its creditors to be substantially engaged in selling the goods of others.[9]

Id.

46.     Here, TSA operated the stores in its retail chains under the name "The Sports Authority" and not under the name of PAC, thereby satisfying the requirement of subsection (i) of § 9-102(a)(20)(A).   Subsection (ii) is satisfied because TSA was a retail chain and not an auctioneer.  Neither of these requirements was ever disputed by PAC.

47.     To establish a defense based on subsection (iii) of § 9-102(a)(20)(A) (the "substantially engaged/generally known" exception), PAC must be able to prove by a preponderance of the evidence: (1) that TSA was substantially engaged in selling the goods of others; *and* (2) that it was generally known by its creditors that this was the case.  See In re Valley Media, Inc., 279 B.R. 105, 124 (Bankr. D. Del. 2002); In re BRI Corp., 88 B.R. 71, 75 (Bankr. E.D. Pa. 1988) ("[T]he consignor has the 'burden of establishing that an important part of [the consignee's] business was selling the goods of others and that this fact was known as a rule by its creditors.'"); Leverett Co. v. Arthur A. Everts Co. (In re Arthur A. Everts Co.), 35 B.R. 706, 708 (Bankr. N.D. Tex. 1984).[10]

48.     PAC has not engaged in discovery directed to establishing the general knowledge of creditors of the Debtors and neither prong of the substantially engaged/generally known exception is supported by the discovery record in this case.  In any case, such discovery would

---

[9]    The remaining requirements are that "(B) with respect to each delivery, the aggregated value of the goods is $1,000 or more at the time of delivery; (C) the goods are not consumer goods immediately before delivery; and (D) the transaction does not create a security interest that secures an obligation."  Del. Code Ann. tit. 6, § 9-102(a)(20)(B)-(D).  These elements were never disputed by PAC.

[10]    See also Steege v. Affiliated Bank/N. Shore Nat'l (In re Alper–Richman Furs), 147 B.R. 140, 150 (Bankr. N.D. Ill. 1992); ATG Aerospace Ltd. v. High–Line Aviation, Ltd. (In the Matter of High–Line Aviation, Inc.), 149 B.R. 730, 738 (Bankr. N.D. Ga. 1992); Multibank Nat'l of W. Mass., N.A. v. State St. Auto Sales, Inc. (In re State St. Auto Sales, Inc.), 81 B.R. 215, 218 (Bankr. D. Mass. 1988).

have been futile given the irrefutably small role played by consignments in the Debtors' overall inventory supply arrangements.

49.     Courts have identified 20% as the minimum value inventory that must be held on a consignment basis before a merchant may be considered to be "substantially engaged" in the selling of goods of others.  See *Memorandum Opinion*, dated Mar. 7, 2017 [D.I. 37], 12 ("That threshold [for establishing that a consignee is substantially engaged in selling the goods of others] is met if consigned goods make up 20% or more of the value of the consignee's inventory."); In re Valley Media, Inc., 279 B.R. at 125; In re State St. Auto Sales, Inc., 81 B.R. at 216, 218.

50.     Here, *no more than* approximately 14% of the inventory held by TSA was held by it pursuant to consignment arrangements, measured at the Debtors' cost for non-consigned goods and using the concept of "home cost" for consigned goods.  See *Stipulation of Fact Between Debtors and Term Loan Agent* [D.I. 1400].  Home cost means the portion of proceeds that are due to a consignment vendor upon sale of consigned inventory at its full retail price.  See id.  For fiscal year 2015, approximately 9% of revenue was attributable to consigned goods and approximately 11% of inventory was comprised of consigned goods.  See Ex. G at 89:14-17, 93:2294:12.  As of January 2, 2016, approximately 12-13% of inventory was comprised of consigned goods.  See Ex. H at Response No. 25.  The percentage of goods held on consignment decreases in the years prior to 2015 and 2016.  See Ex. G at 91:9-12.  Since TSA was not in fact "substantially engaged in selling the goods of others," it cannot have been generally known by its creditors to have been so engaged.

### 2.    The Discovery Record Provides No
### Support For PAC's Actual Knowledge Defense.

51.    Some courts have recognized an exception to the priority of a perfected senior

creditor in consigned goods where, even though the consignor cannot establish the "substantially

engaged/generally known" exception, the perfected senior creditor had "actual knowledge of the

consignment."   See GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co., 474 F. Supp. 1357, 1363

(W.D. Pa. 1979), aff'd sub nom. A. J. Armstrong Co., Inc., Appeal of, 622 F.2d 578 (3d Cir.

1980).  The creation of this extra-statutory exception to the priority of rights created under the

UCC is premised on the fact that the "substantially engaged/generally known" exception

functions to impute knowledge to a particular creditor based on what is generally known by the

majority of the consignee's creditors.  See Eurpac Serv. Inc. v. Republic Acceptance Corp., 37

P.3d 447, 451 (Colo. App. 2000).  Some courts reason that it would be "absurd" if a creditor with

actual knowledge was treated more favorably than a creditor to whom knowledge was imputed

based on what was generally known by other creditors.  See id. at 450-50.  The "actual

knowledge" exception has no application here.

52.    First, at the time that credit was extended, TSA represented to the Term Loan

Agent that consignment inventory was "an immaterial portion of total inventory for sale."  See

Ex B § 3.06; Schedule 3.06.  TSA also covenanted and represented that it would not, in the

future, have possession of "any property on consignment" other than that "immaterial" portion of

inventory.  See id.  Similar contractual representations regarding the absence of conflicting rights

in property have been held to preclude establishing actual knowledge of such conflicting rights

on the part of the recipient of the representation.  See In re SemCrude, L.P., 504 B.R. 39 (Bankr.

Del. 2013) (finding that purchaser's contention that it had acquired property without actual

knowledge of existence of security interests was supported by seller's warranty that property was being sold free and clear of liens).  The same result should obtain here.

53.    Second, there is no factual basis to assert the actual knowledge of the Term Loan Agent.  In applying the judicially-created exception for creditors with actual knowledge of a consignment, courts have scrupulously limited the exception to circumstances where a financing party knowingly and intentionally asserted rights over goods consigned to its borrower or to the proceeds of such goods.  It is most assuredly not used as a "gotcha" against a creditor caught unawares.

54.    In GBS Meat Industry Pty. Ltd., for example, a company who provided financing for a meat packer was held liable for conversion.  See GBS Meat Industry Pty. Ltd. v. Kress-Dobkin Co., Inc., 474 F. Supp. 1357, 1358 (W.D. Pa. 1979).  The financing company, acting with knowledge of a consignment, received the proceeds of the sale of consigned meat in satisfaction of debt outstanding under a line of credit.  See id. at 1359.  Actual knowledge of the consignment was shown by, *inter alia*, the financing company's receipt of schedules of accounts receivable, performance of periodic full scale audits of the consignee's books and records, and "pervasive control of [the consignee's] operations . . . ."  See id. at 1359-60.  In denying a motion for judgment notwithstanding the verdict or a new trial, the court noted with approval that the trial court had rejected plaintiffs' proposed instruction that the jury could find liability if the financing company "should have known" of the consignment and instead charged the jury that it could hold the financing company liable "only if [the financing company] had actual knowledge that the goods were consigned."  See id. at 1360.

55.    Similarly, in applying the actual knowledge exception in Eurpac, the court emphasized that prior to lending, the creditor knew that a portion of the inventory was consigned

and "specifically refused to lend money against [that] portion," even requiring the debtor to "maintain separate inventory records for consigned goods and purchased goods." Eurpac, 37 P.3d at 449; see also Berk v. State Bank of India, No. 96 CIV. 4972(MBM), 1998 WL 567853 (S.D.N.Y. Aug. 28, 1998) (rejecting actual knowledge argument where consignee "did not inform Bank that [it] dealt in consigned goods until three years after the Bank had loaned money to [consignee]").

56.     In contrast to the cases cited here, there is no evidence of any *knowledge* of an arrangement on this record.  The 2009 UCC-1 filing and notification to Bank of America merely evidence the giving of "notice."  See Del. Code Ann. tit. 6, § 1-202 (defining "notice" of a fact as having "received a notice or notification of it").  Conflating receipt of notice with actual knowledge goes far beyond the bounds of those courts that recognize the "actual knowledge" exception.

57.     Specifically, UCC § 9-324(b) requires a consignment vendor to be perfected before supplying goods to a debtor and to send holders of conflicting security interests notification of the consignor's interest "within five years before the debtor receives possession of that inventory" in order to obtain priority.  Del. Code Ann. tit. 6, § 9-324(b).  UCC § 9-515 requires a creditor to file a continuation statement every five years to maintain perfection.  See Del. Code Ann. tit. 6, § 9-515.  Under PAC's interpretation, if a consignment vendor meets the requirements of UCC § 9-324(b) once, then that vendor maintains priority in consigned goods it supplies *in perpetuity* without taking any further action.  There is no rationale for expanding the extra-statutory actual knowledge exception in a way that erases the statutory language of the UCC.

58.     As one court has cautioned, "fashion[ing] equitable solutions to mitigate the hardship on particular creditors of literal application of statutory filing requirements would have the deleterious effect of undermining the reliance which can be placed upon them.  The harm would be more serious than the occasional harshness resulting from strict enforcement." Uniroyal, Inc. v. Universal Tire & Auto Supply Co., 557 F.2d 22, 23 (1st Cir. 1977).

**III.    Summary Judgment Should Be Granted In Favor Of The Term Loan Agent On Count II Of The Term Loan Agent's Complaint Because The Term Loan Agent Is Entitled To The Remedy Of Disgorgement.**

59.     The Final Order forecloses the possibility that the remittance of the Disputed Proceeds in any way extinguishes or otherwise impairs the Term Loan Agent's security interest. See Final Order ¶ 8 (ordering that any interest in the Prepetition Consigned Goods senior to the interest held by PAC "shall not be deemed to have been extinguished or in any way impaired by remittance" to PAC and "shall be recoverable in an adversary proceeding . . . for disgorgement"). Under the Final Order, the Disputed Proceeds are recoverable by the Term Loan Agent against PAC because, as demonstrated *supra* Section II, the Term Loan Agent has a perfected security interest, senior to PAC's unperfected interest, in the Prepetition Consigned Goods and Disputed Proceeds.  See id.  There is no genuine dispute of material fact that disgorgement of the Disputed Proceeds to the Term Loan Agent is warranted and, thus, the Term Loan Agent is entitled to summary judgment with respect to Count II of its complaint.

## CONCLUSION

For the foregoing reasons, the Term Loan Agent respectfully requests that the Court grant summary judgement in its favor with respect to (i) the Term Loan Agent's Complaint; and (ii) PAC's Counterclaims.

Dated: May 18, 2018
       Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Daniel B. Butz*

Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Daniel B. Butz (No. 4227)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE  19899-1347
Tel: 302-658-9200
Fax: 302-658-3989
Email: rdehney@mnat.com
       gwerkheiser@mnat.com
       dbutz@mnat.com

- and –

**BROWN RUDNICK LLP**

Robert J. Stark (admitted *pro hac vice*)
William R. Baldiga (admitted *pro hac vice*)
May Orenstein (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

*Counsel to Wilmington Savings*
*Fund Society, FSB, as Term Loan Agent*