# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| TSAWD HOLDINGS, INC., *et al.*,[1] | Case No. 16-10527 (MFW)<br>Jointly Administered |
| Debtors. | |
| TSA STORES, INC., TSA PONCE, INC., and TSA CARIBE, INC., | |
| Plaintiffs, | |
| and WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR ADMINISTRATIVE AND COLLATERAL AGENT, | Adv. Pro. No. 16-50317-MFW |
| Plaintiff-Intervenor/<br>Counterclaim Defendant, | **Re: D.I. 96** |
| v. | |
| PERFORMANCE APPAREL CORP. a/k/a HOT CHILLYS, INC., | |
| Defendant/Counterclaim Plaintiff. | |

**PERFORMANCE APPAREL CORP.'S OPENING BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

Dated: May 18, 2018

**POTTER ANDERSON & CORROON LLP**
Jeremy W. Ryan (DE Bar No. 4057)
John A. Sensing (DE Bar No. 5232)
R. Stephen McNeill (DE Bar No. 5210)
1313 North Market Street, Sixth Floor
Wilmington, DE 19899-0951
Telephone: (302) 984-6000
Facsimile: (302) 658-1192

*Counsel to Performance Apparel Corp.*

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: TSAWD Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); TSAWD, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

The Debtors were formerly known as: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).

# **TABLE OF CONTENTS**

**Page(s)**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS .................. 1

SUMMARY OF THE ARGUMENT ................................................................. 3

STATEMENT OF FACTS ............................................................................... 4

      A.   The Debtors' Consignment Program ................................................. 4

      B.   The Debtors' Term Loan Facility ....................................................... 5

      C.   PAC's Consignment Relationship with the Debtors .......................... 6

ARGUMENT .................................................................................................. 7

    I.   SUMMARY JUDGMENT IS PROPER ................................................... 7

   II.   PAC HAS PRIORITY OVER THE TERM LOAN AGENT ..................... 8

      A.   The UCC Does Not Apply to All Consignment
            Relationships .................................................................................... 8

      B.   Actual Knowledge Provides an Additional Exception to
            the Application of the UCC ............................................................... 9

      C.   BOA, the Term Loan Lenders and WSFS All Have Actual
            Knowledge of PAC's Consignment Relationship with
            The Debtors ..................................................................................... 12

CONCLUSION ............................................................................................ 14

## **TABLE OF AUTHORITIES**

**Cases**                                                            **Page(s)**

Affordable Home Enters. v. Nelson,
   1994 WL 315227 (Del. Super. May 25, 1994) ............................................................13

Belmont Int'l, Inc., v. Am. Int'l Shoe Co.,
   831 P.2d 15 (Ore. 1992)...................................................................................10, 11

Celotex Corp. v. Catrett,
   477 U.S. 317 (1986)...............................................................................................7

Eurpac Serv. v. Repub. Acceptance Corp.,
   37 P.3d 447 (Colo. Ct. App. 2000) ....................................................................10, 11

Fariba v. Dealer Servs. Corp.,
   100 Cal. Rptr. 3d 219 (Cal. Ct. App. 2009) ........................................................9, 10, 11

First National Bank v. Olsen,
   403 N.W.2d 661 (Minn. Ct. App. 1987) ......................................................................10

GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.,
   474 F. Supp. 1357 (W.D. Pa. 1979), aff'd without opinion at
   622 F.2d 578 (3d Cir. 1980)................................................................................ 9-10, 11

In re High-Line Aviation, Inc.,
   149 B.R. 730 (Bankr. N.D. Ga. 1992) .................................................................10, 11

In re Key Book Serv., Inc.,
   103 B.R. 39 (Bankr. D. Conn. 1989) ..................................................................10, 11

In re Marriage of Cloney,
   110 Cal. Rptr. 2d 615 (Cal. 2001)............................................................................13

In re Valley Media, Inc.,
   279 B.R. 105 (Bankr. D. Del. 2002) ......................................................................8, 12

Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.),
   416 B.R. 123 (Bankr. D. Del. 2009) ..........................................................................7

Walter E. Heller & Co. Sw. v. Riviana Foods, Inc.,
   648 F.2d 1059 (5th Cir. 1981) ...................................................................................10

Wells Fargo Bank, N.A, v. HomeBanc Corp. (In re Homebanc Mortg. Corp.),
   No. 07-11079 (KJC), 2012 Bankr. LEXIS 6021 (Bankr. D. Del. 2012) .......................7

**STATUTES**

U.C.C. § 2-326 (2002) ...................................................................................................8, 9

U.C.C § 9-102(a)(20) .......................................................................................................8

U.C.C § 9-103(d) .............................................................................................................9

U.C.C § 9-319 ............................................................................................................8, 10

U.C.C § 9-324(b) .............................................................................................................9

**OTHER AUTHORITIES**

Fed. R. Bankr. P. 7056 .....................................................................................................7

Fed. R. Civ. P. 56(c) ........................................................................................................7

Restatement (Third) Agency § 5.03 (2005) ...................................................................12

Performance Apparel Corp. ("PAC") hereby respectfully submits its brief (the "Brief") in support of its Motion for Summary Judgment (the "Motion"), which was filed contemporaneously herewith.

**STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDINGS**

On March 2, 2016 (the "Petition Date"), the above-captioned debtors (collectively, the "Debtors") filed voluntary chapter 11 petitions. That same day, the Debtors filed their *Debtors' Motion for Interim and Final Orders (A) Authorizing the Debtors to (I) Continue to Sell Consigned Goods in the Ordinary Course of Business Free and Clear of All Liens, Claims and Encumbrances and (II) Grant Administrative Expense Priority to Consignment Vendors for Consigned Goods Delivered Postpetition; and (B) Grant Replacement Liens to Consignment Vendors with Perfected Security Interests in Consigned Goods and/or Remit the Consignment Sale Price Arising from the Sale of Consigned Goods to Putative Consignment Vendors* [D.I. 9] (the "Consignment Motion").

On March 15, 2016, three of the Debtors, TSA Stores, Inc., TSA Ponce, Inc. and TSA Caribe, Inc. (collectively, the "Plaintiffs") commenced this adversary proceeding against PAC by filing a *Complaint* [Adv. D.I. 1], seeking, among other things, a declaratory judgment regarding PAC's priority of interest in goods PAC sold to the Debtor on a consignment basis (the "Consigned Goods") and an injunction barring PAC from interfering with the Debtors' sale of the Consigned Goods (the "Injunction"). The next day, Wilmington Savings Fund Society, FSB, ("WSFS") in its capacity as successor Administrative Agent and Collateral Agent (the "Term Loan Agent," and together with the Plaintiffs and PAC, the "Parties") sought to intervene as a plaintiff in this adversary proceeding. On April 8, 2016, Plaintiffs filed their *First Amended Complaint* [D.I. 7] (the "Debtors' Complaint") to correct the caption.

The Term Loan Agent was permitted to intervene, and, on May 16, 2016, filed its own *Complaint* [Adv. D.I. 13] (the "WSFS Complaint"), seeking a declaratory judgment regarding its asserted priority in the Consigned Goods and their proceeds as well as seeking to order PAC to disgorge any proceeds it received from the sale of the Consigned Goods (the "Proceeds").

In the interim, following multiple objections and several interim orders, the Consignment Motion was granted on a final basis on May 3, 2016 at D.I. 1704 (the "Consignment Order"). Paragraph 3 of the Consignment Order authorized the Debtors to continue selling consigned goods provided that the proceeds of such sales were delivered to the consignment vendors in accordance with the terms of their applicable consignment agreements.

On May 17, 2016, PAC filed its answer to the Debtors' Complaint [Adv. D.I. 14] and asserted five counterclaims (two against WSFS and three against the Debtors) ("PAC's Counterclaims"). PAC's Counterclaims against WSFS seek declaratory judgments ordering that: (a) any security interest WSFS purports to have in the Debtors' inventory does not reach or attach to the Consigned Goods; and (b) to the extent it is determined that WSFS holds a lien on the Consigned Goods, such lien is subordinate to the interests of PAC in the Consigned Goods (together, the "PAC WSFS Counterclaims"). PAC's counterclaims against the Debtors assert claims for: (a) breach of contract; (b) replevin; and (c) conversion (collectively, the "PAC Debtor Counterclaims").[2]

---

[2] Due to events that have transpired during the course of the Debtors' cases, the PAC Debtor Counterclaims are either moot or without monetary value. As such, PAC does not seek summary judgment on the PAC Debtor Counterclaims.

2

On June 7, 2016, WSFS filed its answer to the PAC WSFS Counterclaims [Adv. D.I. 18]. On June 30, 2016, PAC filed its answer to the WSFS Complaint [Adv. D.I. 22]. On July 18, 2016, Plaintiffs filed their answer to the PAC Debtor Counterclaims [Adv. D.I. 28].

On July 19, 2016, WSFS filed its *Term Loan Agent's Motion for Partial Judgment on the Pleadings* [Adv. D.I. 29] (the "Motion for Judgment") seeking: (a) judgment in its favor on the WSFS Complaint; and (b) dismissal of the PAC WSFS Counterclaims. Following briefing, the Court denied the Motion for Judgment on March 7, 2017 [Adv. D.I. 38].

Since the Court's ruling on the Motion for Judgment, the Parties have been engaged in fact discovery. Discovery is now complete, and there are no disputed material issues of fact. The Court should grant PAC judgment on its PAC WSFS Counterclaims and the WSFS Complaint and allow PAC to retain all Proceeds.

## SUMMARY OF THE ARGUMENT

1. PAC's rights in the Consigned Goods and their Proceeds are superior to the Term Loan Agent's rights in those goods because the predecessor term loan agent, Bank of America, N.A. ("BOA"), had actual knowledge that PAC was selling those goods on consignment to the Debtors. Bank of America's knowledge in its capacity as term loan agent is attributable to its principals, the term loan lenders (the "Term Loan Lenders"), whose interests are now represented by WSFS in this proceeding. The actual knowledge of the Term Loan Lenders cannot be negated simply because BOA was replaced by WSFS as the Term Loan Agent on the eve of bankruptcy, especially where WSFS itself was also aware of PAC's consignment relationship with the Debtors. Because the Term Loan Lenders had actual knowledge of the sale of the Consigned Goods to the Debtors through

3

BOA (and WSFS), PAC's consignment arrangements with the Debtors are not governed by the UCC, and PAC has priority in the Proceeds.

## STATEMENT OF FACTS

### A. The Debtors' Consignment Program.

A "substantial portion" of the Debtors' business involved the sale of goods on consignment. *Declaration of Jeremy Aguilar in Support of the Debtors' Chapter 11 Petitions and Requests for First Day Relief* [D.I. 22] (the "Aguilar Declaration"), at ¶26. The Debtors' level of consignment inventory has increased since 2011. Ex. A, Debtors' 30(b)(6) Tr. at 37:23-25.[3] Indeed, as of the Petition Date, the Debtors were in possession of approximately 8.5 million units of consigned goods with an estimated invoice cost of $84.8 million. Aguilar Declaration, at ¶26. This represented approximately 14% of the Debtors' total inventory available for sale on the Petition Date. *Stipulations of Fact Between Debtors and Term Loan Agent* [D.I. 1400], at ¶3.

As their consignment sales became more "robust," the Debtors' developed a formal consignment program, whereby consignment vendors would enter into "pay by scan" deal sheets specifically created and provided by the Debtors. See Consignment Motion, at ¶7.[4] These agreements reflected the agreed upon price that would be paid to the consignment vendor upon the sale of its consigned goods by the Debtors. Id. The Debtors would pay the consignment vendor the agreed upon price and would retain the remaining sale

---

[3] All references to "Ex. __" are references to the exhibits attached to the Declaration of R. Stephen McNeill in Support of Performance Apparel Corp.'s Opening Brief in Support of Its Motion for Summary Judgment, which was filed contemporaneously herewith.

[4] The description of the consignment program contained in paragraph 7 of the Consignment Motion was authenticated by Mr. Garrett in the Debtors' 30(b)(6) deposition. See Ex. A, Debtors' 30(b)(6) Tr. at 46:1-3.

proceeds for themselves. Id. In the fiscal year preceding the Petition Date, the Debtors' consignment program generated approximately $244 million in revenues and $128 million in profit for the Debtors. Id. Approximately 170 total vendors were participating in the Debtors' consignment program as of the Petition Date. Aguilar Declaration, at ¶97.

  **B.**  **The Debtors' Term Loan Facility.**

To fund their operations, the Debtors borrowed approximately $1.1 billion. Id. at ¶17. Among those obligations were a $650 million asset-based revolving credit facility (the "ABL Loan") and a $300 million term loan facility (the "Term Loan"). Id. at ¶¶18-21. BOA was the administrative agent under both the ABL Loan and the Term Loan, until it was succeeded by WSFS as Term Loan Agent on or about December 31, 2015.[5] See Ex. B, WSFS 30(b)(6) Tr. at 31:8-10; Ex. C, Succession Agreement.

The operative term loan agreement is that certain Amended and Restated Credit Agreement, dated as of November 16, 2010, by and among The Sports Authority, Inc. ("TSA"), as borrower; Slap Shot Holdings, Corp., TSA Stores, Inc. and TSA Gift Card, Inc., as guarantors; BOA, as administrative agent, and the lenders named therein (as amended, revised or supplemented from time to time, the "Term Loan Agreement"). The Term Loan Agreement is secured by a first-priority lien on the Debtors' hard assets, intellectual property and general intangibles as well as a second-priority lien on the Debtors' inventory and other assets that serve as collateral for the ABL Loan. Aguilar Declaration, at ¶21. Consignment liens were "Permitted Liens" under the terms of the Term Loan Agreement, but the related Security Agreement expressly prohibited the

---

[5] At no point in time was WSFS ever a lender to the Debtors; rather, it acted solely as Term Loan Agent. Ex. B, WSFS 30(b)(6) Tr. at 29:9-17.

Debtors from selling goods on consignment unless otherwise identified in Schedule 3.06 thereto.  Compare Ex. D, Term Loan Agreement, at §7.01(n) (permitting "Liens arising from precautionary UCC filings regarding 'true' operating leases or the consignment of goods to a Loan Party.") with Ex. E, Security Agreement, at § 3.06.[6]  Nevertheless, even though the Debtors' consignment program was in its infancy in 2010, several consignment vendors were listed as holding existing liens on Schedule 7.01(b) to the Term Loan Agreement, including PAC.  Ex. D, Term Loan Agreement, at Schedule 7.01(b).

### C. PAC's Consignment Relationship with the Debtors.

PAC was one of the first vendors to begin selling goods on consignment to the Debtors, and filed a UCC-1 Financing Statement with respect to such goods on August 28, 2009.  See Ex. G, UCC Statement.  PAC sent a letter disclosing its consignment interests to all listed secured parties, including BOA in its capacities as collateral agent under both the ABL Loan and the Term Loan on August 26, 2009, via certified mail.  See Ex. H, Perfection Letters.  Given the timing of its UCC Statement, PAC's consignment interest was specifically identified on Schedule 7.01(b) to the Term Loan Agreement.  Ex. D, Term Loan Agreement, at Schedule 7.01(b).  The last pay by scan agreements entered into between PAC and the Debtors were executed in 2015.  See Ex. I, Pay By Scan Agreements (the "PBS Agreements").

---

[6] Schedule 3.06 to the Security Agreement provided that only "[i]nventory on consignment representing an immaterial portion of total inventory for sale" was permitted. Ex. E, Security Agreement, at Sch. 3.06. Despite statements to the contrary in the Aguilar Declaration, the Debtors would have this Court believe that 14% of its total inventory constituting $244 million in revenue in the year preceding the Petition Date was only an "immaterial portion" of its total revenue.  Compare Aguilar Declaration, at ¶26 (stating, under oath, that consignment goods represented a "substantial portion" of the Debtors' inventory) and Consignment Motion, at ¶7 (setting forth consignment sale statistics in the year preceding the Petition Date) with Ex. F, Debtors' Supplemental 30(b)(6) Testimony, at 14 ("The Debtors had no reason to seek to amend Section 3.06 and Schedule 3.06 of the Security Agreement because, at all relevant times, PBS Goods represented only an immaterial portion of the Debtors' total inventory.").

As of the Petition Date all transactions between the Debtors and PAC were on a consignment basis. Ex. F, Debtors' Supplemental 30(b)(6) Testimony, at 10-11. At that time, the Debtors estimated that the "extended cost" of all PAC Consigned Goods in the Debtors possession was $1,586,446. *Id.* at 16. After the Petition Date, the Debtors continued to pay PAC for the Consigned Goods that were sold, as required by paragraph 3 of the Consignment Order. The Debtors sold or returned all Consigned Goods in their possession by the end of July 2016 and paid the Proceeds to PAC in accordance with the Consignment Order.

## ARGUMENT

**I. SUMMARY JUDGMENT IS PROPER.**

Summary judgment is appropriate when the moving party identifies those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c) (applicable to this matter pursuant to Fed. R. Bankr. P. 7056); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); see also Wells Fargo Bank, N.A, v. HomeBanc Corp. (In re Homebanc Mortg. Corp.), No. 07-11079 (KJC), 2012 Bankr. LEXIS 6021, at *25 (Bankr. D. Del. 2012); Wahoski v. Am. & Efrid, Inc. (In re Pillowtex Corp.), 416 B.R. 123 (Bankr. D. Del. 2009).

No genuine issue as to any material fact remains. The Parties have undergone extensive discovery, and the factual record in these cases is complete. The remaining issues are legal in nature and can properly be resolved by this Court under Rule 56(c).

## II. PAC HAS PRIORITY OVER THE TERM LOAN AGENT.

### A. The UCC Does Not Apply to All Consignment Relationships.

Following the Court's ruling on the Motion for Judgment, the primary open legal issue is whether the Uniform Commercial Code ("UCC") applies to PAC's consignment relationship with the Debtors. Section 9-102 of the UCC defines "consignment" as a "transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and: (A) the merchant: (i) deals in goods of that kind under a name other than the name of the person making delivery; (ii) is not an auctioneer; and (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others . . ." UCC § 9-102(a)(20)(A). If, and only if, this definition is satisfied do the other provisions of Article 9 apply. In re Valley Media, Inc., 279 B.R. 105, 124 n.33 (Bankr. D. Del. 2002) ("[I]f the consignee is not a merchant, then the relationship is not a consignment and [section 9-319] does not apply.").

Section 9-102(a)(20) is the successor to old UCC section 2-326(3). U.C.C. § 2-326. cmt 4. Despite differences in wording, no substantive change was intended by the drafters of revised section 9-102(a)(20). See U.C.C. § 9-319, cmt. 2 ("Insofar as creditors of the consignee are concerned, this Article to a considerable extent reformulates the former law, which appeared in former Sections 2-326 and 9-114, without changing the results."). UCC section 2-326(3) provided three exceptions to its application: (1) where the consignor complied with an applicable sign law; (2) where the debtor is "generally known by his creditors to be substantially engaged in selling the good of others"; or (3) when the consignor complies with the filing provisions of UCC Article 9. U.C.C. § 2-326(3)(a)-(c) (2002). Thus, section 9-102(a)(20) does not apply—meaning the transaction

8

is not a consignment for purposes of the UCC—if any of these exceptions apply. Valley Media, 279 B.R. at 124 n.33 (discussing the technical differences in how a transaction would not constitute a consignment under old UCC section 2-326 and new UCC section 9-102(a)(20)).

If none of the foregoing exceptions apply, the priority of a consignment vendor's interest in its consigned goods will be governed by the UCC. UCC section 9-103(d) provides that a consignment vendor's security interest in its consigned goods is treated as "a purchase-money security interest in inventory." U.C.C. § 9-103(d). Accordingly, the priority of a consignment vendor's interest in its consigned goods vis-à-vis other creditors of the debtor is governed by UCC section 9-324(b). Likewise, for purposes of determining a competing creditor's rights in the consigned goods, the debtor is "deemed to have rights and title to the goods identical to those the consignor had or had the power to transfer." Id. § 9-319(a). Once again, the rights provided to other creditors of a debtor under this section of the UCC are similar to the rights provided under the earlier version of the UCC, including sections 2-326 and 9-114. Id. §9-319(a), at cmt. 2.

**B.       Actual Knowledge Provides an Additional Exception to the Application of the UCC.**

While not expressly listed in the statute, most courts that have interpreted section 9-102(a)(20) and its predecessor have found that a creditor's actual knowledge of another creditor's consignment interest satisfies the "general knowledge" exception. See, e.g., GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co., 474 F. Supp. 1357, 1363 (W.D. Pa. 1979), aff'd without opinion at 622 F.2d 578 (3d Cir. 1980) ("[W]here a secured creditor knows that the proceeds rightfully belong to a consignor, the consignor must have priority. Any other construction of 2-326 would contravene the intent of that section and would sanction

9

intentional conversions of goods or proceeds."); Fariba v. Dealer Servs. Corp., 100 Cal. Rptr. 3d 219, 229 (Cal. Ct. App. 2009) ("[C]onstruing the knowledge exception to include constructive knowledge, but not actual knowledge, would lead to absurd results and we shall not interpret our Commercial Code in such a manner."); Eurpac Serv. v. Repub. Acceptance Corp., 37 P.3d 447, 450-51 (Colo. Ct. App. 2000) (finding actual knowledge operates as an exception to the UCC); Belmont Int'l, Inc., v. Am. Int'l Shoe Co., 831 P.2d 15, 19 (Ore. 1992) (same); First National Bank v. Olsen, 403 N.W.2d 661, 665 (Minn. Ct. App. 1987) ("[T]he case law interpreting § 2-326 creates a broader interpretation of the exceptions and establishes an exemption if the secure creditor had actual knowledge of the consignment.").

Those cases, and others, have relied upon the UCC's intent as a basis for adopting the actual knowledge exception. Because the UCC is designed to protect creditors from hidden liens on consignment goods,[7] courts have found that such protection is not necessary where the creditor is aware of the consignment—and thus, the lien is not secret. See Eurpac, 37 P.3d at 450 ("The purpose of the exceptions is to allow the consignor to 'protect himself by showing that the creditor had no right to assume that the goods were owned by the consignee.'"); Fariba, 100 Cal. Rptr. 3d at 229 (adopting actual knowledge as an exception to UCC § 9-319 and reasoning that such an exception "gives full effect to the purpose of the statute as explained in the official comments. It does not burden creditors with 'secret liens' while providing limited protection to consignors who never intended to lose title to their property. It also avoids the result of giving greater weight to

---

[7] See Walter E. Heller & Co. Sw. v. Riviana Foods, Inc., 648 F.2d 1059, 1062 (5th Cir. 1981); In re Key Book Serv., Inc., 103 B.R. 39, 43 (Bankr. D. Conn. 1989) ("The purpose of [former section 2-326] is to prevent creditors from being misled by a hidden lien.").

10

imputed knowledge than actual knowledge"); In re High-Line Aviation, Inc., 149 B.R. 730, 737 (Bankr. N.D. Ga. 1992) ("[I]f a creditor knows that goods in a debtor's place of business are on consignment, the creditor is not misled by the presence of the consigned goods and its lien should not extend to them."); Belmont, 831 P.2d at 19 ("The assumption is that, 'where a secured creditor has knowledge of consignments, he will certainly not advance funds to the consignee based on the consignee's possession of the consigned property.'") (citation omitted); In re Key Brook Serv., Inc., 103 B.R. 39, 43 (Bankr. D. Conn. 1989) (finding that the exceptions are designed to protect creditors who have been misled by secret liens, not secured creditors with knowledge of the consignment relationship). Some courts have extended this rationale even further, finding that denying an actual knowledge exception would permit conversion[8] or result in an absurdity.[9]

Under the PBS Agreements, Colorado law governs the substantive rights of the parties, while both Colorado and Delaware law govern the definition of consignment under UCC § 9-102. See Ex. I, PBS Agreements, at 2 (providing that the agreement will satisfy definition of consignment under both Colorado and Delaware versions of UCC). As cited above, Colorado acknowledges the actual knowledge exception to Article 9. See Eurpac Serv. v. Repub. Acceptance Corp., 37 P.3d 447, 450-51 (Colo. Ct. App. 2000). However, there is no Delaware case law specifically ruling on this issue, aside from the Third Circuit's affirmance of GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co., which recognized the actual knowledge exception.

---

[8]     GBS Meat Indus. Pty. Ltd., 474 F. Supp. at 1363.

[9]     See Fariba, 100 Cal. Rptr.3d at 229 (finding that permitting the knowledge exception to include constructive, but not actual, knowledge would create absurd results); Eurpac, 37 P.3d at 450-451 ("Failure to acknowledge an 'actual knowledge' exception would lead to an absurd result.") (citation omitted).

The primary consignment case from Delaware is Judge Walsh's decision in In re Valley Media, Inc., 279 B.R. 105 (Bankr. D. Del. 2002). Valley Media, however, is easily distinguishable because: (1) the dispute was between the debtor and consignor, as opposed to a consignor and a creditor of the consignee; and (2) Judge Walsh expressly acknowledged that the dispute there was between the consignment vendor and a creditor without actual knowledge. Id. at 122 n.23 & 125 n.36. Moreover, Judge Walsh's decision turned primarily on the issue of whether a subdivision of the debtor was an entity separate and apart from the debtor or merely an unincorporated division thereof. Id. at 127-131. Finally, even if Judge Walsh had declined to acknowledge the actual knowledge exception, such a ruling would not be binding on this Court.

### C. BOA, the Term Loan Lenders and WSFS All Have Actual Knowledge of PAC's Consignment Relationship with the Debtors.

In any event, though, any holding contained in Valley Media cannot vitiate the actual knowledge of BOA, WSFS, and the Term Loan Lenders that PAC was selling goods on consignment to the Debtors. WSFS cannot dispute that BOA had express knowledge of PAC's consignment relationship with the Debtors since late August 2009. See Ex. H, Perfection Letters; Ex. B, WSFS 30(b)(6) Tr. at 98:18-24 ("Q. So is it fair to say then that as of the time the credit agreement was entered, Bank of America and all the other parties to the credit agreement were on notice that Performance Apparel was a secured party with regard to its consignment inventory? A. Yes."). BOA acted as the agent for the Term Loan Lenders.

Under general principles of agency law, an agent's knowledge of material facts related to its duties as agent is imputed from the agent to its principals. Restatement (Third) Agency § 5.03 (2005). A corporation will be bound by information obtained by its agent

12

that would be viewed as "important in view of the agent's duties and prior knowledge." Affordable Home Enters. v. Nelson, 1994 WL 315227, at *7-9 (Del. Super. May 25, 1994) (citing Restatement (Second) Agency § 275, comment d (1958)). Moreover, an agent has a duty to disclose all material information, or information "that may affect [it's] principal's decision [making process]." In re Marriage of Cloney, 110 Cal. Rptr. 2d 615, 624 (Cal. 2001). Therefore, any material knowledge that BOA had while serving as agent for the Term Loan Lenders must be imputed to the lenders, who certainly would consider the existence of a consignment relationship—especially one affecting the priority of their liens—as "important." Accordingly, any knowledge that BOA obtained regarding PAC's consignment relationship with the Debtors would thus be imputed to the Term Loan Lenders.

Furthermore, because BOA's knowledge of PAC's consignment relationship with the Debtors was imputed to the Term Loan Lenders prior to BOA ceding the role of administrative agent for the Term Loan Agreement to WSFS, it is not relevant whether WSFS had actual knowledge of the consignment relationship.[10] Because the Term Loan Lenders own the rights and claims asserted by WSFS in this dispute, it is the Term Loan Lenders' knowledge that is relevant. Nevertheless, WSFS, itself, knew that PAC was selling goods on consignment to the Debtors prior to taking over as Term Loan Agent. Ex. B, WSFS 30(b)(6) Tr. at 100:23-101:3 ("Q. Okay. So prior to becoming the administrative agent then, WSFS would have been placed on notice that Performance Apparel, as of the time of the credit agreement, had certain permitted liens, correct? A. Yes.").

---

[10] At no point in time was WSFS ever a lender to the Debtors; rather, it acted solely as Term Loan Agent. Ex. B, WSFS 30(b)(6) Tr. at 29:9-17.

13

For all of the above reasons, PAC has established that it has priority over the Term Loan Agent, and should have judgment granted in its favor as to the WSFS Complaint and the PAC WSFS Counterclaims.

## CONCLUSION

For the foregoing reasons, PAC respectfully requests that the court (i) grant its Motion for Summary Judgment on the PAC WSFS Counterclaims; (ii) dismiss the WSFS Complaint with prejudice; and (iii) grant PAC any further relief to which it is otherwise entitled.

Respectfully submitted,

Dated: May 18, 2018
Wilmington, Delaware

**POTTER ANDERSON & CORROON LLP**

*/s/ John A. Sensing*
Jeremy W. Ryan (DE Bar No. 4057)
John A. Sensing (DE Bar No. 5232)
R. Stephen McNeill (DE Bar No. 5210)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Telephone: (302) 984-6000
Fax: (302) 658-1192
Email: jryan@potteranderson.com
jsensing@potteranderson.com
rmcneill@potteranderson.com

*Counsel to Performance Apparel Corp.*