## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re:<br><br>TSAWD HOLDINGS, INC., *et al.*,[1]<br><br>               Debtors. | Chapter 11<br><br>Case No. 16-10527 (MFW)<br><br>(Jointly Administered) |
| TSA STORES, INC., TSA PONCE, INC., and TSA CARIBE, INC.,<br>               Plaintiffs,<br>and WILMINGTON SAVINGS FUND SOCIETY, FSB, AS SUCCESSOR ADMINISTRATIVE AND COLLATERAL AGENT,<br>               Plaintiff-Intervenor/<br>               Counterclaim Defendant,<br>               v.<br>PERFORMANCE APPAREL CORP. a/k/a HOT CHILLYS, INC.,<br>               Defendant/Counterclaim Plaintiff. | Adv. Pro. No. 16-50317-MFW<br><br>Re: D.I. 96 |

## MEMORANDUM OF LAW OF THE TERM LOAN AGENT IN OPPOSITION TO PERFORMANCE APPAREL CORP.'S MOTION FOR SUMMARY JUDGMENT

MORRIS, NICHOLS, ARSHT & TUNNELL LLP
Robert J. Dehney (No. 3578)
Gregory W. Werkheiser (No. 3553)
Daniel B. Butz (No. 4227)
1201 N. Market St., 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Tel: 302-658-9200

*Counsel to Wilmington Savings*
*Fund Society, FSB, as Term Loan Agent*

BROWN RUDNICK LLP
Robert J. Stark (admitted *pro hac vice*)
William R. Baldiga (admitted *pro hac vice*)
May Orenstein (admitted *pro hac vice*)
Bennett S. Silverberg (admitted *pro hac vice*)
Seven Times Square
New York, NY 10036
Tel: (212) 209-4800

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: TSAWD Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); TSAWD, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664). The headquarters for the above-captioned Debtors is located at 1050 West Hampden Avenue, Englewood, Colorado 80110.

    The Debtors were formerly known as: Sports Authority Holdings, Inc. (9008); Slap Shot Holdings, Corp. (8209); The Sports Authority, Inc. (2802); TSA Stores, Inc. (1120); TSA Gift Card, Inc. (1918); TSA Ponce, Inc. (4817); and TSA Caribe, Inc. (5664).

# TABLE OF CONTENTS

**Page**

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING .................................. 1

SUMMARY OF ARGUMENT ........................................................................................ 1

COUNTERSTATEMENT OF FACTS ............................................................................... 4

      I.      PAC Enters Into A Consignment Relationship With TSA, Perfects Its Purchase-Money Security Interest, Then Permits Its UCC Financing Statement To Lapse. ... 4

      II.     The Term Loan Agent's Lack Of Knowledge. ........................................................ 7

ARGUMENT ............................................................................................................... 8

      I.      Legal Standard. ..................................................................................................... 8

      II.     UCC Priority Rules Apply To Goods Supplied Under The PBS Agreement. .......... 9

      III.    Any Knowledge Obtained By Bank Of America Cannot Be Imputed To The Term Loan Lenders. ................................................... 16

CONCLUSION ............................................................................................................ 20

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

Affordable Home Enters., Inc. v. Nelson,
  C.A. No. 91C-08-024, 1994 WL 315227 (Del. Supr. May 25, 1994) ....................................19

Am. Nat'l Bank v. Joy (In re Joy),
  169 B.R. 931 (Bankr. D. Neb. 1994) ...............................................................................12, 13

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986)......................................................................................................................8

ATG Aerospace, Inc. v. High-Line Aviation Ltd. (In re High-Line Aviation, Inc.),
  149 B.R. 730 (Bankr. N.D. Ga. 1992) .....................................................................................13

Berk v. State Bank of India,
  No. 96 CIV. 4972(MBM), 1998 WL 567853 (S.D.N.Y. Aug. 28, 1998)...............................13

Burman v. Richmond Homes Ltd.,
  821 P.2d 913 (Colo. App. 1991) ...............................................................................................17

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986)......................................................................................................................8

D C Comics, Inc. v. Powers,
  465 F. Supp. 843 (S.D.N.Y. 1978) ...........................................................................................18

Eurpac Serv. Inc. v. Republic Acceptance Corp.,
  37 P.3d 447 (Colo. App. 2000) .............................................................................................9, 13

Fariba v. Dealer Servs. Corp.,
  178 Cal. App. 4th 156 (Cal. Ct. App. 2009) .......................................................................12, 14

First Nat'l Bank of Blooming Prairie v. Olsen,
  403 N.W.2d 661 (Minn. 1987)...................................................................................................13

GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co.,
  474 F. Supp. 1357 (W.D. Pa. 1979).....................................................................................12, 14

Gregg v. Cloney (In re Marriage of Cloney),
  110 Cal. Rptr. 2d 615 (Cal. Ct. App. 2001) .............................................................................19

Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts., LLC,
  27 Misc.3d 1236(A) (N.Y. Sup. Ct. 2010)................................................................................18

Huston v. Procter & Gamble Paper Prods. Corp.,
   568 F.3d 100 (3d Cir. 2009)............................................................................16, 19

In re M/V Rickmers Genoa Litig.,
   622 F.Supp.2d 56 (S.D.N.Y.) ..................................................................................17

Meisel v. Grunberg,
   651 F. Supp. 2d 98 (S.D.N.Y. 2009).........................................................................18

Multibank Nat'l of W. Mass., N.A. v. State Street Auto Sales, Inc. (In re State
   Street Auto Sales, Inc.),
   81 B.R. 215 (Bankr. D. Mass. 1988) ....................................................................9, 10

Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital
   Mgmt., L.P. (In re Broadstripe, LLC),
   444 B.R. 51 (Bankr. D. Del. 2010) .............................................................................8

In re SemCrude L.P.,
   864 F.3d 280 (3d Cir. 2017)...............................................................................14, 16

Uniroyal, Inc. v. Universal Tire & Auto Supply Co.,
   557 F.2d 22 (1st Cir. 1977)......................................................................................15

In re Valley Media, Inc.,
   279 B.R. 105 (Bankr. D. Del. 2002) .........................................................................10

**Statutes**

UCC § 1-202 .......................................................................................................14

UCC § 9-102 ...................................................................................................9, 11

UCC § 9-324 .......................................................................................................11

UCC § 9-515 .......................................................................................................11

**Other Authorities**

Fed. R. Bankr. P. 7056.............................................................................................8

Fed. R. Civ. P. 56....................................................................................................8

Restatement (Second) of Agency § 272....................................................................19

Restatement (Third) of Agency § 8.07 (2006) ..........................................................16

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

1.      Intervenor/Counterclaim-Plaintiff Wilmington Savings Fund Society, FSB ("WSFS"), as successor administrative and collateral agent (the "Term Loan Agent") under that certain Amended and Restated Credit Agreement, dated as of November 16, 2010 (the "Term Loan Credit Agreement"), by and among The Sports Authority, Inc., as the Borrower, Slap Shot Holdings Corp., as Holdings, Wilmington Savings Fund Society, FSB, as successor Administrative Agent and Collateral Agent to Bank of America, N.A, and the lenders from time to time party thereto (the "Term Loan Lenders"), hereby respectfully submits this memorandum of law in opposition to the motion of Defendant/Counterclaim-Plaintiff Performance Apparel Corp. a/k/a Hot Chillys, Inc. ("PAC") for summary judgment (the "Motion").

## SUMMARY OF ARGUMENT

2.      Generally under the UCC, a creditor's perfected security interest in consignment inventory held by a debtor is senior to a consignor's unperfected interest.  PAC does not claim to have remained continuously perfected through the Petition Date.  Rather, PAC appears to acknowledge the incontestable truth that prior to the Petition Date, it simply allowed its 2009 filings to lapse.

3.      Given its failure to perfect its lien, PAC moves for summary judgment based on the "actual knowledge" exception to the above stated general rule.  *Based solely on lapsed filings and notices*, PAC claims that at all times after 2009, Bank of America, the predecessor Term Loan Agent, "actually knew" that the Debtors' inventory included PAC goods held on consignment.  PAC then argues that this "actual knowledge" is imputed to the Term Loan Lenders.

4.      To be clear, PAC has abandoned all other defenses and arguments that it previously raised in its answer, counterclaims, and opposition to the Term Loan Agent's Motion

for Judgment on the Pleadings.[2]  PAC does not claim or seek to establish that any creditors of the

Debtors had knowledge of its consignment practices or the scope of those consignment practices,

or that the Debtors were substantially engaged in the sale of goods of others.    PAC's

abandonment of its earlier positions specifically includes an apparently fabricated claim that its

consignment agreements had been terminated prior to the Petition Date.  This alleged but non-

existent termination, for which there is no basis in fact whatsoever, was one of the grounds upon

which the Court denied the Term Loan Agent's Motion for Judgment on the Pleadings.[3]

5.    PAC's Motion falls far short of establishing its priority over the Term Loan Agent

based on the "actual knowledge" exception upon which it exclusively relies for two basic

reasons.

6.    First, PAC proffers no evidence whatsoever of "actual knowledge."  After months

of discovery, PAC cannot make a *prima facie* case that Bank of America had actual knowledge

that goods supplied by PAC to the Debtors pre-Petition (the "Prepetition Consigned Goods")

were not owned by the Debtors.  Instead of evidence of "actual knowledge," PAC points to a

notice to Bank of America sent in 2009 explaining that PAC would be consigning certain goods

to TSA Stores, Inc. ("TSA") and the appearance of PAC's 2009 UCC-1 financing statements in a

---

[2]    In its Motion, PAC characterizes its counterclaims against the Debtors as "either moot or without monetary value . . . ."  See PAC Br. 2 n.2.  In fact, these counterclaims, which are predicated on the purported termination of PAC's consignment agreements, were frivolous when made.  PAC admits that following the Petition Date, "[t]he Debtors sold or returned all Consigned Goods in their possession by the end of July 2016 and paid the Proceeds to PAC in accordance with the Consignment Order."  See PAC Br. 7.  At his deposition, the chief executive officer of PAC testified that PAC's relationship with the Debtors had "never" been terminated.  See Ex. A to *Declaration of May Orenstein in Support of Term Loan Agent's Opposition to Performance Apparel Corp.'s Motion for Summary Judgment*, dated June 15, 2018 (Wells Depo. Tr.) at 67:20-68:2.  Mr. Wells in fact made clear that the request for a return to vendor does not operate as a termination, explaining at length that PAC seasonal goods were shipped back to PAC at the end of every season, "fluffed up" and then returned to the Debtors' stores the next season.  Id. at 62:7-21.  Notwithstanding these admissions, PAC has not agreed to stipulate to the dismissal of those claims.  This fabrication and then maintenance of meritless claims has resulted in the prolongation of discovery and the needless waste of resources.

[3]    See Memorandum Opinion, TSA Stores, Inc. v. Performance Apparel Corp., Adv. No. 16-50317 (Bankr. D. Del. Mar. 7, 2017), D.I. 37, at 20.

schedule of existing liens attached to the 2010 Term Loan Credit Agreement.  As a matter of law, however, "notice" is not the same thing as actual knowledge.  Indeed, the UCC clearly distinguishes between notice and actual knowledge.

7.      Further, under the UCC, PAC was required to file a continuation statement and supply a fresh notice in 2014 in order to preserve its perfected, priority interest in consigned goods.  It failed to do so.  As a matter of law, a lapsed notice cannot be given the effect of a current one – to rule otherwise would materially undermine the workings of the UCC filing and notice systems upon which creditors rely in extending credit.  As a matter of common sense, a secured creditor would infer from PAC's actions that PAC was no longer supplying consigned goods to TSA.

8.      The second deficiency in PAC's Motion is its focus on the knowledge of Bank of America.  PAC does not purport to have evidence that a single Term Loan Lender had actual knowledge of PAC's consignment arrangement with the Debtors.  The absence of evidence that the Term Loan Lenders knew of the PAC consignment is fatal to the Motion because, as a matter of law, any purported knowledge of the Term Loan Agent cannot be imputed to the Term Loan Lenders.  What a principal knows by way of its agent depends on the nature and scope of an agent's duties to the principal.  Here, Bank of America's knowledge cannot be imputed to the Term Loan Lenders because Bank of America had no duty, and indeed had specifically disclaimed any duty, to provide the Term Loan Lenders any information in the possession of Bank of America under the Term Loan Credit Agreement.

9.      The Term Loan Credit Agreement provides that the Term Loan Agent "shall not have any duty or responsibility to provide any Lender with any other credit or other information

concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Administrative Agent." TLA Ex. A § 9.07.[4]

10.     Section § 9.03 is to similar effect. It states that:

> The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents. Without limiting the generality of the foregoing, the Administrative Agent: . . . shall not . . . have any duty to disclose . . . any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

Id. § 9.03(c).

11.     As established herein, absent a duty to communicate information, Bank of America's knowledge is not imputed to the Term Loan Lenders. Summary judgment in favor of PAC should be denied.

### COUNTERSTATEMENT OF FACTS

I.     **PAC Enters Into A Consignment Relationship With TSA, Perfects Its Purchase-Money Security Interest, Then Permits Its UCC Financing Statement To Lapse.**

12.     As part of its business, the Debtors developed a pay-by-scan program for the sale of goods on consignment. Sports Authority's main suppliers, such as Nike, did not participate in the pay-by-scan program. See TLA Ex. G (Garrett Depo. Tr.) at 39:9-40:13. Historically, the program was a minor part of the Debtors' business. See id. at 37:12-25, 42:15-43:3; TLA Ex. H (Debtors' Suppl. Testimony) at Response No. 1. As of the Petition Date, only a small percentage of the Debtors' inventory was held on consignment. In fiscal year 2015, consigned goods represented approximately 11% of the debtors' inventory and approximately 9% of revenue. See TLA Ex. G at 89:14-17, 93:22-94:12. Those percentages were likely lower in the years prior to

---

[4]     Citations to "TLA Ex." refer to exhibits attached to the *Declaration of May Orenstein in Support of Term Loan Agent's Motion for Summary Judgment*, dated May 18, 2018 [D.I. 94].

2015.  See id. at 91:9-12.  During these chapter 11 cases, the Debtors stipulated that as of the Petition Date, *no more than* approximately 14% of the inventory of the Debtors was available for sale on consignment . . . ."  See *Stipulation of Fact Between Wilmington Savings Fund, FSB, as Term Loan Agent and Debtors*, In re Sports Authority Holdings, Inc., Case No. 16-10527 (MFW) (Bankr. D. Del. May 3, 2016) [D.I. 1400] (emphasis added).  This percentage may not have exceeded 11%.  See TLA Ex. G at 96:22-97:15.

13.     To participate in the pay-by-scan program, a vendor would enter into a "pay by scan" deal sheet specifying whether the vendor would be paid on a cost or retail split basis.  See, e.g., TLA Ex. I; TLA Ex. J; TLA Ex. G at 83:22-25.  The Debtors would pay the consignment vendor either an agreed-upon amount for each item sold or an agreed-upon percentage of the retail sale price.  See TLA Ex. G at 84:18-85:8.  The Debtors would retain the remaining proceeds, if any, from the sale.  In 2009, PAC began participating in the Debtors' pay-by-scan program and, as of the Petition Date, supplied all goods to the Debtors on consignment.  See PAC Br. 6-7;[5]  TLA Ex. H at Response No. 18.

14.     The most recent pay-by-scan deal sheets were entered into on or around August 2015 (the "PBS Agreements").  See TLA Exs. I-J.  One deal sheet concerned socks supplied by PAC on a retail split basis.  See TLA Ex. I (the "PBS Agreement I").  A second deal sheet concerned base layer products supplied by PAC on a cost basis.  See TLA Ex. J (the "PBS Agreement II").

15.     Pursuant to the PBS Agreements, PAC agreed that the arrangement between it and TSA Stores, Inc. ("TSA") was "a consignment as defined in Section 9-102 of the Colorado

---

[5]    See *Performance Apparel Corp.'s Opening Brief in Support of its Motion for Summary Judgment*, dated May 18, 2018 [D.I. 97] (the "PAC Br.").

and Delaware Uniform Commercial Codes." TLA Exs. I-J.[6] The PBS Agreement also "entitled [PAC] to file UCC-1 Financing Statements to reflect this consignment." Id.

16.     PAC filed a UCC-1 financing statement in Pennsylvania on or about August 28, 2009. See TLA Ex. K. The financing statement references the attached Exhibit A for a description of the collateral. Exhibit A lists twenty-two products by their style numbers and names, all of which appear to be "base layers," an apparel item worn for cold weather sports. See id. PAC mailed a notice, dated August 26, 2009, of its UCC filing to Bank of America. See TLA Ex. L. That notice referenced UCC § 9-324(b) and explained that PAC "will be consigning certain performance base layer garments to TSA Stores, Inc." and "will be filing UCC-1 Financing Statements to confirm its consignment interest in such goods . . . ." Id. When the Term Loan was refinanced in 2010, PAC was identified in a schedule of "[l]iens existing on the date hereof" attached to the Term Loan Credit Agreement as Schedule 7.01(b). See PAC Ex. D at TLA00001170-1178.[7]

17.     Following this August 2009 filing, PAC did not file any continuation statements or additional UCC-1 financing statements.

18.     Pursuant to orders issued by the Bankruptcy Court permitting the Debtors to sell consigned goods and remit the proceeds to consigning vendors (subject to disgorgement to the Term Loan Agent to the extent that the Term Loan Agent is adjudicated to have an interest in such goods senior to any interest held by a consigning vendor), the Debtors sold the Prepetition Consigned Goods. See TLA Ex. O (Declaration of Douglas Garrett sworn to on May 11, 2018).

---

[6]   The applicable provisions of the UCC discussed herein are the same as enacted in Colorado and Delaware. Citations to the "UCC" herein refer to the UCC as enacted in Colorado (Colo. Rev. Stat. § 4-9-101, *et seq.*) and Delaware (Del. Code Ann. tit. 6, § 9-101, *et seq.*).

[7]   Citations to "PAC Ex." refer to exhibits attached to the *Declaration of R. Stephen McNeill in Support of Performance Apparel Corp.'s Opening Brief in Support of its Motion for Summary Judgment*, dated May 18, 2018 [D.I. 100].

$243,485.37 represents the proceeds remitted to PAC for the post-Petition sale of goods supplied by PAC to the Debtors pre-Petition.  See id.

## II.     The Term Loan Agent's Lack Of Knowledge.

19.     There is no evidence that either of the two entities that have served as administrative and collateral agent to the Term Loan Lenders under the Term Loan Credit Agreement had knowledge of PAC's consignment of inventory to the Debtors.  WSFS testified that it had no pre-Petition communications with the Debtors or others regarding the consignment program.  See TLA Ex. M at 49:18-51:7, 67:18-69:25 (testimony of WSFS 30(b)(6) witness, Pat Healy (who had primary responsibility for the Term Loan Agent relationship), regarding the lack of any pre-petition communications with WSFS regarding the Debtors' consignment program generally and PAC's consignment relationship with the Debtors specifically).  The Debtors, for their part, have denied communicating to Bank of America, WSFS or the Term Loan Lenders regarding the Debtors' pay-by-scan arrangements until after they had already filed for bankruptcy.  See TLA Ex. H at Response No. 27.

20.     The information about the Borrower that was received by the Term Loan Agent under the Term Loan Credit Agreement, such as statements identifying all owned and leased property and a report summarizing insurance coverage, did not include information on the Debtors' consignment or "pay by scan" program.  See TLA Ex. A § 6.01.

21.     Pursuant to the Term Loan Security Agreement, the Debtors represented and warranted that no borrower or guarantor possessed any property on consignment, except for inventory on consignment representing an immaterial portion of total inventory for sale.  The Debtors also covenanted that they would not, in the future, acquire material amounts of inventory on consignment.  See Ex. TLA Ex. B § 3.06; Schedule 3.06 ("Except [for an immaterial portion of total inventory for sale], no Grantor has, and none shall have, possession of any property on

consignment.").   After entry into the Term Loan Credit Agreement, the Debtors certified on a quarterly basis to the Term Loan Agent that they were in compliance with each covenant and condition under the Term Loan documents, including the Term Loan Security Agreement's covenant not to hold a material portion of inventory on consignment.  See, e.g., TLA Ex. N.

## ARGUMENT

### I.    Legal Standard.

22.    Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, made applicable to adversary proceedings through Rule 7056 of the Federal Rules of Bankruptcy Procedure, summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); Fed. R. Bankr. P. 7056.  The goal "is to isolate and dispose of factually unsupported claims or defenses . . . ."  Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

23.    To accomplish that goal, the movant bears the burden of establishing that no genuine dispute as to any material fact exists.  See id. at 321.  In other words, the movant must "put the ball in play, averring an absence of evidence to support the nonmoving party's case."  Official Unsecured Creditors' Comm. of Broadstripe, LLC v. Highland Capital Mgmt., L.P. (In re Broadstripe, LLC), 444 B.R. 51, 76 (Bankr. D. Del. 2010).  Thereafter, the burden shifts to the nonmovant to "supply sufficient evidence . . . for a reasonable jury to find for the nonmovant."  Id. at 77.  In this process, the Court must resolve all doubts and consider the evidence in the light most favorable to the nonmoving party.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

## II.    UCC Priority Rules Apply To Goods Supplied Under The PBS Agreement.

24.    Where an arrangement between a supplier of goods and a merchant falls within the UCC definition of a consignment, the lien of a perfected secured creditor (like the Term Loan Agent) has priority over the claim of an unperfected consignor (like PAC).

25.    Excluded from the definition of a UCC consignment is a transaction involving the delivery of goods to a merchant that is "generally known by its creditors to be substantially engaged in selling the goods of others . . . ."  UCC § 9-102(a)(20).  The effect of this language is to impute knowledge to a particular creditor based on what is generally known by the majority of the consignee's creditors.  See Eurpac Serv. Inc. v. Republic Acceptance Corp., 37 P.3d 447, 451 (Colo. App. 2000).

26.    Departing from this statutory formulation, some courts have held that, even though the consignor has not established what is generally known by the creditors of the debtor or that the debtor is substantially engaged in consignment sales, the carve out will apply if the consignor shows that a creditor "actually knows" of the consignment arrangement involving the disputed inventory.  Relying on the effect of the "generally known / substantially engaged" test, the court in Eurpac Serv. adopted this actual knowledge exception, opining that it would be "absurd" if a creditor with actual knowledge was treated more favorably than a creditor deemed to have constructive knowledge based on what is shown to be "generally known."  See id. at 450-51.  Under Eurpac, a creditor that seizes goods or proceeds from the sale of goods that the creditor actually knows belong to another party may be found liable for conversion.  See id. at 451.

27.    Other courts reject the actual knowledge exception because it undermines policy choices embedded in the relevant provisions of the UCC.  See, e.g., Multibank Nat'l of W. Mass., N.A. v. State Street Auto Sales, Inc. (In re State Street Auto Sales, Inc.), 81 B.R. 215,

219-20 (Bankr. D. Mass. 1988).  As pointed out in <u>State Street Auto Sales</u>, in order to perfect its security interest, a purchase money security interest ("<u>PMSI</u>") holder must both perfect by filing and provide the holder of the conflicting interest with a timely notice.  <u>Id.</u> at 220.  If the holder of a PMSI fails to fulfill these requirements, then, regardless of the actual knowledge of a secured party with a conflicting interest, that secured party has priority with regard to the PMSI-covered goods.  If a secured creditor's actual knowledge of a PMSI has no bearing on its priority, it is unclear why a consigning vendor to a merchant not generally known to be engaged in consignment transactions should be treated more leniently.[8]

28.    Assuming *arguendo* that the actual knowledge exception is potentially available, PAC has not established its applicability here.  PAC's Motion is predicated on the notion that its compliance *in 2009* with UCC § 9-324 requirements for obtaining priority over the Term Loan Lenders is sufficient to establish *prima facie* that Bank of America, the predecessor Term Loan Agent, had actual knowledge of PAC's consignment arrangement with the Debtors *at all times thereafter, including through the March 2, 2016 Petition Date.*  <u>See</u> PAC Br. 12; PAC Ex. H.  In support of this position, PAC asserts that WSFS "cannot dispute that BoA had express knowledge of PAC's consignment relationship with the Debtors *since late August 2009*."  PAC Br. 12.  As evidence for this, PAC points to the affirmative answer given by WSFS acknowledging that "*as of the time the credit agreement was entered* [*i.e.*, 2010] Bank of America and all the other parties to the credit agreement were *on notice* that Performance Apparel was a secured party . . . ."  <u>Id.</u>

---

[8]    The PBS Agreements provide that "TSA and Vendor agree that the arrangement completed by this agreement shall be a consignment as defined in Section 9-102 of the Colorado and Delaware Uniform Commercial Codes." TLA Exs. I-J.  Research by the Term Loan Agent has not resulted in the identification of any ruling regarding whether the exception is recognized under the Delaware UCC.  <u>Cf.</u> <u>In re Valley Media, Inc.</u>, 279 B.R. 105, 132 (Bankr. D. Del. 2002) (explaining that a consignor "might prevail" over a secured creditor of a consignee "with actual knowledge of the consignment," but will not prevail over a trustee exercising its powers pursuant to 11 U.S.C. § 544(a)).

29.     As this illustrates, rather than providing evidence of Bank of America's actual knowledge, PAC urges the Court to accept an expired notice as a substitute for the statutory "generally known / substantially engaged" exception found in UCC § 9-102(a)(20).  UCC § 9-324(b) requires a consignment vendor to be perfected before supplying goods to a debtor and to send holders of conflicting security interests notification of the consignor's interest "within five years before the debtor receives possession of that inventory" in order to obtain priority.  UCC § 9-324(b).  UCC § 9-515 requires a creditor to file a continuation statement every five years to maintain perfection.  See UCC § 9-515.  In 2014, PAC allowed its UCC-1 financing statement to lapse and failed to provide a new notification of its consignment interest.  As a result, PAC's 2009 notice to Bank of America was no longer operative as of 2014.

30.     Contrary to PAC's fanciful view, a lapsed notice does not supply actual knowledge of the existence of a consignment arrangement.  The reasonable inference to be drawn from PAC's choice to allow its perfected interest in consigned goods to lapse in 2014 is that PAC was no longer supplying goods on consignment to TSA.  Even if, *arguendo*, a secured creditor could be expected to interpret a lapsed notice and UCC-1 filing as evidence that a consignment relationship exists, PAC fails to cite a single case (and the Term Loan Agent is aware of none) where the giving of notice demonstrates the "actual knowledge" of the notice-receiving party for purposes of establishing priority.  Under PAC's formulation, the "actual knowledge" requirement in the cases relied upon by PAC is dispensed with and any evidence of facts that might put a secured lender on notice are substituted.  This approach turns the statutory rules of priority on their head.

31.     In contrast to the approach urged by PAC here, courts that have applied the actual knowledge exception have done so in a circumspect manner.  Two courts have interpreted the

actual knowledge exception as requiring the consignor to demonstrate a creditor's actual knowledge that the debtor was substantially engaged in selling the goods of others. See Fariba v. Dealer Servs. Corp., 178 Cal. App. 4th 156, 167 (Cal. Ct. App. 2009); Am. Nat'l Bank v. Joy (In re Joy), 169 B.R. 931, 940 (Bankr. D. Neb. 1994).  PAC has not argued that it meets this standard—nor could it because the Debtors were not substantially engaged in selling the goods of others.  No more than approximately 14% of the inventory held by TSA was on consignment, less that the 20% threshold necessary to be substantially engaged in selling the goods of others. See *Stipulation of Fact Between Debtors and Term Loan Agent* [D.I. 1400]; Memorandum Opinion, TSA Stores, Inc. v. Performance Apparel Corp., Adv. No. 16-50317 (Bankr. D. Del. Mar. 7, 2017), D.I. 37, at 12 ("That threshold [for establishing that a consignee is substantially engaged in selling the goods of others] is met if consigned goods make up 20% or more of the value of the consignee's inventory.").

32.    Cases that adopt the broadest form of the actual knowledge exception have eschewed any requirement to show that a merchant was substantially engaged in selling consigned goods.  These courts have, however, unequivocally required direct evidence of actual knowledge or circumstantial evidence of a secured creditor's hand's on involvement with a debtor that includes in-depth access to the debtor's records of consignment transactions.  For example, in GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co., Inc., evidence of actual knowledge included the lender's almost daily contact with the debtor, its conduct of full-scale audits of the debtor's books and records and accounts payable, and a history of prior payment made by the lender, on behalf of the debtor, directly to the consignor for the sale of its consigned goods.  See GBS Meat Indus. Pty. Ltd. v. Kress-Dobkin Co., 474 F. Supp. 1357, 1359-60 (W.D. Pa. 1979).

33.     In <u>Eurpac</u>, the issue on appeal with regard to the priority of the secured creditor appears to have been entirely a legal one – whether the court would recognize the actual knowledge exception.  <u>See</u> <u>Eurpac Serv. Inc.</u>, 37 P.3d at 451, 452.  The opinion indicates that there was no factual dispute about the actual knowledge of the secured creditor: the parties agreed that the secured creditor knew of the consigned inventory (against which it had refused to lend), had access to records segregating the inventory into consigned goods and owned goods and then, after default, seized and sold the consigned inventory along with the other inventory. <u>See</u> <u>id.</u> at 449; <u>see also</u> <u>First Nat'l Bank of Blooming Prairie v. Olsen</u>, 403 N.W.2d 661, 665 (Minn. 1987) (bank had actual knowledge where it was told by a customer that the customer owned 1,487 heads of cattle held by the debtor); <u>ATG Aerospace, Inc. v. High-Line Aviation Ltd. (In re High-Line Aviation, Inc.)</u>, 149 B.R. 730, 737 (Bankr. N.D. Ga. 1992) (finding a genuine issue of fact where lender's executive testified that he knew the debtor was selling consignor's goods on consignment from reading inventory reports prepared by debtor and communicating with the debtor's employees).

34.     In contrast to the cases cited here, there is no evidence of Bank of America's *knowledge* of the Debtors' consignment activities or that documentation regarding those activities was provided to Bank of America.  <u>See</u> <u>Berk v. State Bank of India</u>, No. 96 CIV. 4972(MBM), 1998 WL 567853 (S.D.N.Y. Aug. 28, 1998) (rejecting actual knowledge argument, noting that "this is not a case, such as <u>GBS Meat Industry</u>, where the creditor knowingly financed or took an active role in a consignment enterprise"); <u>In re Joy</u>, 169 B.R. at 933 (refusing to find actual knowledge where documents submitted by debtor to the lender's loan committees indicated that the "majority of debtor's income" was derived from the sale of his own goods).

35.    The filing in 2009 of a UCC-1 financing statement by PAC and notification to Bank of America at that time accomplished, at most, giving "notice" to Bank of America.  This is because under the UCC, a person gives "notice" by "taking such steps as may be reasonably required to inform the other person in ordinary course, *whether or not the other person actually comes to know of it*."    UCC § 1-202(d) (emphasis added); <u>see also</u> UCC § 1-202(a) (distinguishing between "receiv[ing] a notice" and "actual knowledge").

36.    Under governing Third Circuit case law, more is required than a stale, lapsed notice to create an issue of fact as to "actual knowledge" that could operate to alter the priority rights of a perfected, secured creditor.  This is illustrated in <u>SemCrude</u>, in which the Third Circuit refused to find an issue of fact as to oil purchasers' actual knowledge of certain oil producers' unperfected liens based on facts that arguably placed the purchasers on constructive notice of those liens.  The Court observed "[d]espite volumes of discovery, at most the Producers have produced indications of constructive knowledge (a reason to know), but U.C.C. § 1-202(b) requires 'actual knowledge.'"    <u>In re SemCrude L.P.</u>, 864 F.3d 280, 295 (3d Cir. 2017).

37.    It is well established that constructive knowledge is not sufficient to take a consignment transaction outside of the UCC.  <u>See</u> <u>GBS Meat Indus.</u>, 474 F. Supp. at 1360 (noting with approval that the trial court had rejected plaintiffs' proposed instruction that the jury could find liability if the financing company "should have known" of the consignment and instead charged the jury that it could hold the financing company liable "only if [the financing company] had actual knowledge that the goods were consigned").  The actual knowledge exception stems from the view that it would be absurd to hold a creditor responsible based on the fiction of imputing to the creditor what is generally known by a debtor's creditors, but not to hold the same creditor responsible for its actual knowledge.  <u>See, e.g.</u>, <u>Fariba</u>, 178 Cal. App. 4th

14

at 169.  While this observation provides some rationale for carving out an extra-statutory exemption from the UCC for creditors with actual knowledge, this rationale does not extend to supplanting the constructive knowledge test found in the UCC consignment definition with a different one.

38.  The holding of SemCrude – that where actual knowledge is a standard under the UCC, a movant may not meet its burden through facts arguably indicative of constructive knowledge – applies even more forcefully here.  According to PAC's position, the giving of notice once in 2009 establishes the absence of any issue with respect to actual knowledge not merely at the time it was given, but well beyond the five-year statutory period prescribing such notice – perhaps indefinitely.  This is an absurd and commercially unreasonable outcome.

39.  There is no rationale for expanding the extra-statutory actual knowledge exception in a way that erases the statutory language of the UCC.  As one court has cautioned, "fashion[ing] equitable solutions to mitigate the hardship on particular creditors of literal application of statutory filing requirements would have the deleterious effect of undermining the reliance which can be placed upon them.  The harm would be more serious than the occasional harshness resulting from strict enforcement."  Uniroyal, Inc. v. Universal Tire & Auto Supply Co., 557 F.2d 22, 23 (1st Cir. 1977).  No court has sanctioned the use of the actual knowledge exception to force a secured lender to defend against inherently speculative suggestions of what it knew based on stale filings.  If anything, the expiration of PAC's UCC-1 financing statement and notice would suggest to a secured lender the expiration of PAC's consignment relationship with TSA.  Accordingly, the Motion should be denied.

40.  Under SemCrude there is an additional basis for rejecting PAC's assertions of actual knowledge.  In that case, the court found that where a seller expressly warranted to the

purchasers that there were no liens on the oil, those purchasers could not be found to have actual knowledge of the producers' liens.  See In re SemCrude L.P., 864 F.3d at 295.  Similarly, here TSA covenanted to the Term Loan Agent that it would not, in the future, have "any property on consignment" other than an "immaterial" portion of inventory.  See TLA Ex. B § 3.06, Schedule 3.06.  Like the purchasers in SemCrude, the Term Loan Agent was entitled to rely on the contractual covenants provided by the Debtors and, as a result, should not be found to have actual knowledge of PAC's consignment arrangement.

## III.    Any Knowledge Obtained By Bank Of America Cannot Be Imputed To The Term Loan Lenders.

41.    The creation of an agency relationship does not result in the imputation to the principal of the entire universe of facts known to the agent. "Rather, there are two parameters limiting when knowledge of facts known by an agent is imputed to the principal: the agent's duties to the principal; and the materiality – or significance – of the facts in question to those duties."  Huston v. Procter & Gamble Paper Prods. Corp., 568 F.3d 100, 106 (3d Cir. 2009).  Adopting the limitation on imputation found in the Restatement (Third) of Agency, the Third Circuit stated that the "scope of an agent's duties delimits the content of knowledge that is imputed to the principal."  Id.

42.    Where agency is created by a contract, that contract defines the scope of the agency and hence, the scope of the agent's duty.  See Restatement (Third) of Agency § 8.07 (2006) ("An agent has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal.").  Under New York law, which governs the Term Loan Credit Agreement,[9] an agent's "authority to do an act can be created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe

---

[9]    See TLA Ex. A § 11.14(a).

that the principal desires him so to act on the principal's account." <u>In re M/V Rickmers Genoa</u> <u>Litig.</u>, 622 F.Supp.2d 56, 74 (S.D.N.Y.) (citing Restatement (Second) of Agency § 26); <u>see also</u> <u>Burman v. Richmond Homes Ltd.</u>, 821 P.2d 913, 920 (Colo. App. 1991) ("The relationship between an agent and a principal is contractual and is defined by contract.  The rights and duties of the principal and agent must be found in the express or implied terms of the agreement.").

43.     Here, the Term Loan Agent's duties were limited to those expressly created in the Term Loan Credit Agreement, an agreement to which the Term Loan Agent and Term Loan Lenders were parties.  <u>See</u> TLA Ex. A § 9.01(a) ("Each of the Lenders hereby irrevocably appoints Bank of America to act on its behalf as the Administrative Agent hereunder and under the other Loan Documents and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto."); § 9.01(b) ("[E]ach of the Lenders . . . hereby irrevocably appoints and authorizes the Administrative Agent to act as the agent of such Lender for purposes of acquiring, holding and enforcing any and all Liens on Collateral . . . ."); § 9.03 ("The Administrative Agent shall not have any duties or obligations except those expressly set forth herein and in the other Loan Documents.").

44.     PAC makes the bare assertion that information obtained by the predecessor Term Loan Agent regarding the existence of a consignment relationship would be considered "important in view of the agent's duties . . . ."  <u>See</u> PAC Br. 13.  That statement finds no support in the Term Loan Credit Agreement which defines the agent's duties.  The Term Loan Credit Agreement expressly disclaims any duty to provide information relating to the Borrower or its affairs.  <u>See</u> TLA Ex. A § 9.07 ("The Administrative Agent shall not have any duty or

responsibility to provide any Lender with any other credit or other information concerning the affairs, financial condition or business of any Loan Party that may come into the possession of the Administrative Agent."); id. § 9.03(c) (providing that the Term Loan Agent "shall not, except as expressly set forth herein and in the other Loan Documents, have any duty to disclose . . . any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity").

45.     Further, each Term Loan Lender acknowledges that having made its initial investment based on its own credit analysis without reliance on information from the Term Loan Agent, it will continue to act independently of the Term Loan Agent "based on such documents and information as it shall from time to time deem appropriate . . . ." See id. § 9.07. Provisions limiting the duties owed to investors, when agreed to among sophisticated institutions, are routine and enforceable. See Harbinger Capital Partners Master Fund I, Ltd. v. Wachovia Capital Mkts., LLC, 27 Misc.3d 1236(A), at *5-7 (N.Y. Sup. Ct. 2010) (enforcing provision with language nearly identical to Section 9.07 of the Term Loan Credit Agreement, observing that it provided "in the plainest language" that lenders were not relying on representations by the agent and precluded fraud claim).

46.     Because the Term Loan Agent had no duty to provide information regarding consignments to the Term Loan Lenders, any such knowledge that the Term Loan Agent purportedly had is not imputed to the Term Loan Lenders. See Meisel v. Grunberg, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009) ("Knowledge acquired by an agent acting *within the scope of its agency* is imputed to the principal.") (emphasis added); D C Comics, Inc. v. Powers, 465 F. Supp. 843, 849 n. 8 (S.D.N.Y. 1978) ("Before a parent's knowledge will be imputed to its

subsidiary, it must be shown that the parent's employees informed of the infringement were under a duty to report that information to the subsidiary.").

47.     While the contract language of the Term Loan Credit Agreement is conclusive as to the scope of the duties of the Term Loan Agent, the result would be the same even without contractual disclaimers.  The largely ministerial duties of the Term Loan Agent did not touch upon monitoring the transactions and business practices of the Debtors.  Under the Restatement, knowledge is not to be imputed unless it is material *to duties*.  See Restatement (Second) of Agency § 272; Huston, 568 F.3d at 107 (explaining that facts must be "important or significant" *to an agent's duty* to its principal "to justify imputing" knowledge of facts).

48.     Cases cited to by PAC do not support its imputation argument.  In Affordable Home Enters., Inc. v. Nelson, a park manager's knowledge of the condition of the park's septic system was imputed to her employer where part of her duties included maintaining the septic system.  See Affordable Home Enters., Inc. v. Nelson, C.A. No. 91C-08-024, 1994 WL 315227, at *3 (Del. Supr. May 25, 1994).  As the court explained, "[t]he principal is bound only by the agent's knowledge which appears to be important in view of the agent's duties and prior knowledge."  Id.  Similarly, in In re Marriage of Cloney, the court imputed to a purchaser of real property his escrow agent's actual knowledge of the full name of the seller because such information was necessary for the escrow agent to carry out her duties as escrow agent.  See Gregg v. Cloney (In re Marriage of Cloney), 110 Cal. Rptr. 2d 615, 623-25 (Cal. Ct. App. 2001). In so holding, the court acknowledged that "[t]he scope of imputation of knowledge is directly related to the scope of the duty arising from the agency agreement . . . ."  Id. at 623-23.  Here, by contrast, the scope of the Term Loan Agent's duties arising from the Term Loan Credit Agreement did not extend to reporting information on consignment relationships.

19

## **CONCLUSION**

For the foregoing reasons, the Term Loan Agent respectfully requests that the Court deny the Motion.

Dated: June 15, 2018
       Wilmington, Delaware

                    **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**
                    */s/ Daniel B. Butz*
                    Robert J. Dehney (No. 3578)
                    Gregory W. Werkheiser (No. 3553)
                    Daniel B. Butz (No. 4227)
                    1201 N. Market St., 16th Floor
                    P.O. Box 1347
                    Wilmington, DE  19899-1347
                    Tel: 302-658-9200
                    Fax: 302-658-3989
                    Email: rdehney@mnat.com
                           gwerkheiser@mnat.com
                           dbutz@mnat.com

                         - and –

                    **BROWN RUDNICK LLP**
                    Robert J. Stark (admitted *pro hac vice*)
                    William R. Baldiga (admitted *pro hac vice*)
                    May Orenstein (admitted *pro hac vice*)
                    Bennett S. Silverberg (admitted *pro hac vice*)
                    Seven Times Square
                    New York, NY 10036
                    Tel: (212) 209-4800
                    Fax: (212) 209-4801

                    *Counsel to Wilmington Savings*
                    *Fund Society, FSB, as Term Loan Agent*