**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11 |
| | ) | |
| TSAWD HOLDINGS, INC., et al. | ) | |
| | ) | Case No. 16-10527 (MFW) |
| Debtors. | ) | |
| _____ | ) | |
| | ) | (Jointly Administered) |
| TSA STORES, INC., TSA PONCE, | ) | |
| INC., and TSA CARIBE, INC., | ) | |
| et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| and WILMINGTON SAVINGS FUND | ) | Adv. No. 16-50317 (MFW) |
| SOCIETY, FSB, AS SUCCESSOR | ) | |
| ADMINISTRATIVE AND COLLATERAL | ) | |
| AGENT, | ) | |
| | ) | |
| Plaintiff- | ) | |
| Intervenor | ) | |
| Counterclaim | ) | |
| Defendant | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| PERFORMANCE APPAREL CORP. | ) | |
| a/k/a HOT CHILLY'S, INC., | ) | |
| | ) | |
| Defendant/ | ) | |
| Counterclaim | ) | |
| Plaintiff | ) | |
| _____ | | |

**OPINION**[1]

Before the Court are cross-motions for summary judgment

under Rule 56(a) of the Federal Rules of Civil Procedure.

Plaintiff-Intervenor Wilmington Savings Fund Society, FSB

_____

[1]     This Opinion constitutes the findings of fact and
conclusions of law of the Court pursuant to Rule 7052 of the
Federal Rules of Bankruptcy Procedure.

("WSFS") seeks disgorgement of proceeds from certain goods sold

on consignment.  Defendant Performance Apparel Corporation

("PAC") contends it is entitled to keep the proceeds because

WSFS's actual knowledge of the consignment relationship between

PAC and the Debtors precludes WSFS from claiming a superior

interest in goods that PAC sold to the Debtors on consignment.

The Court agrees with PAC and finds that WSFS had actual

knowledge of PAC's consignment interest which precludes it from

obtaining a superior interest in the consigned goods.

Accordingly, the Court will grant PAC's motion and deny WSFS's

motion for summary judgment.


I.    JURISDICTION

The Court has jurisdiction over this core adversary

proceeding.  28 U.S.C. §§ 157(b)(2)(K) & 1334.  The Court has

constitutional authority to enter a final order based on the

parties' consent.  (D.I. 1 & 14 at ¶ 3.)  See Wellness Int'l

Network, Ltd. v. Sharif, 135 S. Ct. 1932 (2017) (finding that

parties' consent permits a bankruptcy judge to enter a final

order or judgment on a claim).


II.   FACTUAL BACKGROUND

On March 2, 2016 (the "Petition Date"), The Sports Authority

Holdings, Inc., and its affiliates (the "Debtors") filed

2

voluntary chapter 11 petitions.  The Debtors were national
retailers of sporting goods and active apparel.

As part of their business, the Debtors developed a program
for the sale of goods on consignment.  To participate in the
program, vendors entered into a "pay by scan" deal sheet
specifying whether they would be paid on a cost or retail split
basis.  The Debtors would then pay the vendor in accordance with
the terms of the consignment agreement.

PAC was one of the first vendors to begin selling goods on
consignment to the Debtors.  PAC filed a UCC-1 financing
statement with respect to consigned goods on August 28, 2009, and
gave notice to the Agent at that time for the Term Loan Lenders.
(Orenstein Decl. Ex. K, Adv. D.I. 93-11; McNeill Decl. Ex. H at
2, Adv. D.I. 100-8.)   However, there is no evidence that PAC
filed a continuation statement for that UCC-1.

Pre-petition, the Debtors had borrowed approximately $1.1
billion, which included a $650 million asset-based revolving
credit facility (the "ABL Loan") and a Term Loan of $300 million.
Bank of America ("BOA") was the administrative agent under both
loans.  An Amended and Restated Credit Agreement was executed by
BOA and the Debtors on November 16, 2010.  (Orenstein Decl. Ex.
D, Adv. D.I. 93-4.)  The Term Loans were secured by a
first-priority lien on the Debtors' hard assets, intellectual
property and general intangibles as well as a second-priority

lien on the Debtors' inventory and other assets that also served

as collateral for the ABL Loan.  (Id. at Ex. B, Adv. D.I. 93-2.)

The Term Loan lien was perfected by the execution of a Security

Agreement and the filing of UCC financing statements in the

appropriate jurisdictions.  (Id. at Exs. B-F, Adv. D.I. 93-

2,3,4,5,6.)  On December 31, 2015, WSFS replaced BOA as the

Administrative and Collateral Agent for the Term Loan.  (Id. at

Ex. C. 31:8-10, Adv. D.I. 93-3.)

As of the Petition Date, approximately 11-12% of the

Debtors' total inventory was for sale on consignment.  (McNeill

Decl. Ex. F at 2, Adv. D.I. 100-6.)  Early in the case, an issue

arose as to the Debtors' authority to pledge or sell consigned

goods in their possession.[2]  Pending the filing of (and ruling

on) an adversary proceeding to determine respective rights to the

consigned goods,[3] the Court permitted the Debtors to sell the

---

[2]    See Motion for Interim and Final Orders (A) Authorizing
the Debtors to (I) Continue to Sell Consigned Goods in the
Ordinary Course of Business Free and Clear of All Liens, Claims
and Encumbrances and (II) Grant Administrative Expense Priority
to Consignment Vendors for Consigned Goods Delivered
Postpetition; and (B) Grant Replacement Liens to Consignment
Vendors with Perfected Security Interests in Consigned Goods
and/or Remit the Consignment Sale Price Arising from the Sale of
Consigned Goods to Putative Consignment Vendors and Objections
thereto.  (D.I. 9; Agron Obj., D.I. 102; Gordini Obj., D.I. 110;
Wigwam Mills Obj., D.I. 608; ASICS Am. Corp. Obj., D.I. 644;
Casio Obj., D.I. 646; Ameriform Acquisition Co. Obj., D.I. 656.)

[3]    See In re Whitehall Jewelers Holding, Inc., Bankr. No.
08-11261, 2008 WL 2951974, at *4 & *6 (Bankr. D. Del. July 28,
2008) (holding that a bankruptcy court cannot allow the sale of
consigned goods as "property of the estate" under section 363

consigned goods so long as they complied with the terms of the consignment agreements, including making payments to the consignors.[4]  The final order preserved WSFS's rights, as Term Loan Agent, including the right to recoup any payments made to the consignors from the sale of the consigned goods if it were determined that WSFS has a superior security interest in them.[5]

As of the Petition Date, all transactions between the Debtors and PAC were on a consignment basis.  (Id. at 10-11.)  At that time, the Debtors estimated that the "extended cost" of all PAC consigned goods in the Debtors' possession was $1,586,446.  (Id. at 16.)  Postpetition, the Debtors continued to pay PAC for consigned goods that were sold pursuant to the Consignment Order.  By the end of July 2016, the Debtors had returned or sold all consigned goods in their possession and paid the proceeds to PAC in accordance with the Consignment Order.

On March 15, 2016, the Debtors filed a Complaint against PAC seeking, inter alia, a declaratory judgment regarding the priority of PAC's interest in the consigned goods.  (Compl., Adv. D.I. 1.)  WSFS intervened as a plaintiff.  (WSFS Intervention Order, April 27, 2016, Adv. D.I. 9.)

---

without first determining that it is property of the estate through an adversary proceeding).

[4]     Interim Order, March 11, 2016, D.I. 278.

[5]     Final Order, May 3, 2016, D.I. 1704.

On July 19, 2016, WSFS filed a motion for partial judgment on the pleadings contending that its lien is superior to PAC's interests.  (WSFS Motion, Adv. D.I. 29.)  The Court denied that motion finding there were factual issues in dispute.  (Opinion, March 7, 2017, Adv. D.I. 37.)

On May 18, 2018, the parties filed cross-motions for summary judgment seeking a determination of their respective interests in the consigned goods and their proceeds.  (WSFS Motion, Adv. D.I. 91; PAC Motion, Adv. D.I. 96.)  Briefing is complete, and the matter is now ripe for decision.

III.  DISCUSSION

A.    Rule 56 Standard of Review

Rule 7056 of the Federal Rules of Bankruptcy Procedure incorporates Rule 56(c) of the Federal Rules of Civil Procedure which sets forth the applicable summary judgment standard.  Fed. R. Bankr. P. 7056; Fed. R. Civ. P. 56(c).  Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  See also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (holding that the party moving for summary judgment has the initial burden of demonstrating the absence of a dispute of material fact).  Admissions in pleadings, affidavits, and discovery and disclosure

6

materials on file, including all factual inferences derived

therefrom, are viewed in the light most favorable to the

nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S.

242, 247 (1986).

B. Priority of Liens under the UCC

1. Contention of WSFS

In its motion for summary judgment, WSFS contends that it

has a perfected security interest under the Uniform Commercial

Code ("UCC") that is superior to the security interest asserted

by PAC because PAC allowed its 2009 UCC-1 financing statement to

lapse, thereby resulting in its interest becoming unperfected.

WSFS presented evidence to establish that the Term Loan

Credit Agreement granted it a lien on, inter alia, the Debtors'

inventory and proceeds. (Orenstein Decl. Ex. F at 7, Adv. D.I.

31-6.) That lien was secured by the execution of a Security

Agreement and the filing of UCC-1 financing statements in the

appropriate jurisdictions. (Id. at Exs. G & H, Adv. D.I. 31-7 &

8.)

WSFS also presented evidence that PAC had filed a UCC-1

financing statement with respect to the goods it sold to the

Debtors on August 28, 2009, and gave notice to the Term Loan

Agent. (Id. at Ex. K, Adv. D.I. 94-11; McNeill Decl. Ex. H.,

Adv. D.I. 98-8.) No evidence was presented that PAC filed a

continuation statement for that UCC-1.

As a result, WSFS contends that its perfected security interest has priority over PAC's unperfected security interest in the consigned goods under § 9-322(a) of the UCC, which provides:

> (a) General priority rules.  Except as otherwise provided in this section, priority among conflicting security interests and agricultural liens in the same collateral is determined according to the following rules:
>> (1) Conflicting perfected security interests and agricultural liens rank according to priority in time of filing or perfection. Priority dates from the earlier of the time a filing covering the collateral is first made or the security interest or agricultural lien is first perfected, if there is no period thereafter when there is neither filing nor perfection.
>> (2) A perfected security interest or agricultural lien has priority over a conflicting unperfected security interest or agricultural lien.

Del. Code Ann. tit. 6, § 9-322(a)(2).  See also id. at § 9-324(b) (providing that a consignor's purchase money security interest is superior to another perfected security interest in inventory only if the consignment interest is perfected and notice is given to the competing creditor within five years before the debtor receives the goods).

　　　　2.　　PAC's Contention

PAC argues that notwithstanding the lapse of its UCC security interest, WSFS cannot assert its rights are superior to PAC.  PAC contends that its consignment rights are not subject to the filing requirements and priorities of the UCC at all, because the Term Loan Lenders had actual knowledge of PAC's consignment

arrangement with the Debtors before the Term Loan was extended.

### 3.   Applicability of the UCC to Consignments

Section 9-102 of the UCC describes whether an arrangement is a "consignment" for Article 9 purposes:

> "Consignment" means a transaction, regardless of its form, in which a person delivers goods to a merchant for the purpose of sale and:
>     (A) the merchant:
>         (i) deals in goods of that kind under a name other than the name of the person making delivery;
>         (ii) is not an auctioneer; and
>         (iii) is not generally known by its creditors to be substantially engaged in selling the goods of others;
>     (B) with respect to each delivery, the aggregate value of the goods is $1,000 or more at the time of delivery;
>     (C) the goods are not consumer goods immediately before delivery; and
>     (D) the transaction does not create a security interest that secures an obligation.

Del. Code Ann. tit. 6, § 9-102(a)(20) (section 9-102 was previously codified at section 2-326).  See, e.g., In re Valley Media, Inc., 279 B.R. 105, 122 (Bankr. D. Del. 2002).

Under section 9-102(a)(20), an arrangement is not a consignment subject to the priorities of the UCC if a consignor can show that the consignee's creditors generally knew that it was substantially engaged in selling consigned goods.  See Valley Media, 279 B.R. at 123-24.  If that is the case, then the consignee's creditors cannot obtain a lien or other interest in the consigned goods.  Id.

In addition, some courts have held that Article 9's priority rules will not apply vis-a-vis another secured creditor if it had <u>actual knowledge</u> that goods were held on consignment when its security interest was granted.  <u>See, e.g.</u>, <u>GBS Meat Ind. Pty. Ltd. v. Kress-Dobkin Co., Inc.</u>, 474 F. Supp. 1357, (W.D. Pa. 1979), <u>aff'd without opinion at</u> 622 F.2d 578 (3d Cir. 1980) (concluding that there is an "actual knowledge" exception to § 9-102); <u>In re Key Book Serv., Inc.</u>, 103 B.R. 39, 43 (Bankr. D. Conn. 1989) (finding that the UCC did not give a bank priority in books owned by publishers and held by the debtor where the bank had received actual knowledge of the publishers' interest while negotiating its loan with the debtor); <u>Fariba v. Dealer Servs. Corp.</u>, 178 Cal. App. 4th 156, 169 (Cal. Ct. App. 2010) (concluding that actual knowledge of a consignment lien is an exception to the priority provisions of the UCC); <u>Eurpac Serv., Inc. v. Republic Acceptance Corp.</u>, 37 P.3d 447, 451 (Colo. App. 2000) (holding that a creditor who has actual knowledge of a debtor selling goods belonging to others satisfies the "generally known" and "substantial engagement" exception in UCC § 9-102(a)(20)); <u>Belmont Int'l, Inc. v. Am. Int'l Shoe Col.</u>, 831 P.2d 15, 19 (Or. 1992) (agreeing with courts who hold that a creditor's actual knowledge of a consignment relationship is sufficient to remove the consignment from the requirements of the UCC).

The reasoning of those courts is that the UCC policy of protecting creditors from the "secret lien" of a consignor is not implicated if the creditor in question has actual knowledge of the consignor's lien.  The courts note that if a creditor's <u>constructive</u> knowledge of a consignment lien (from the filing of a UCC financing statement or from the fact that other creditors generally know the debtor is selling consigned goods) is sufficient to give the consignor priority, it would be absurd to conclude that <u>actual</u> knowledge of the consignment is not sufficient.  <u>See, e.g.</u>, <u>Fariba</u>, 178 Cal. App. 4th at 169 (opining that "construing the knowledge exception to include constructive knowledge, but not actual knowledge, would lead to absurd results . . . [such as] giving greater weight to imputed knowledge than actual knowledge"); <u>Eurpac</u>, 37 P.3d at 451 ("It would be absurd to hold a creditor responsible for imputed knowledge but not hold the same creditor responsible for actual knowledge.").

Those courts also conclude that allowing an "actual knowledge" exception does not offend the underlying UCC policy of protecting creditors from secret liens.  <u>See, e.g.</u>, <u>Fariba</u>, 178 Cal. App. 4th at 167 ("since the purpose of the notice exception is to 'protect creditors from the "hidden" claim of the consignor, it should follow that a creditor of a consignee who has *actual knowledge* that the consignee is a consignee cannot claim the protection thereof.'") (quoting 3A Lawrence's Anderson

on the Uniform Commercial Code (3d ed. 2009 supp.) Sales, § 2-326:97) (emphasis added); GBS Meat, 474 F. Supp. at 1363 ("The clear import of the comments to [the predecessor to § 9-102(a)(20)], and the judicial precedents discussed above establish that, where a secured creditor knows that the proceeds rightfully belong to a consignor, the consignor must have priority.  Any other construction . . . would contravene the intent of that section and would sanction intentional conversions of goods or proceeds."); In re High-Line Aviation, Inc., 149 B.R. 730, 737 (Bankr. N.D. Ga. 1992) (adopting the reasoning of GBS and concluding that "if a creditor knows that goods in a debtor's place of business are on consignment, the creditor is not misled by the presence of consigned goods and its lien should not extend to them"); Key Book, 103 B.R. at 43 (concluding that the purpose of the UCC is "to prevent creditors from being misled by a hidden lien" and so it should be limited to "instances where creditors of a consignee may have been misled by a secret lien") (citations omitted); Belmont, 831 P.2d at 19 (noting that the purpose of the UCC "is to protect the creditors of a consignee from the consignor's hidden liens on the consignment goods").

There are cases to the contrary, but the Court does not find them persuasive.  See Russell v. Mountain Nat'l Bank (In re Russell), 254 B.R. 138, 141 (Bankr. W.D. Va. 2000) (concluding that a bank's knowledge of a consignment does not preclude it

from asserting rights against the consignor when the bank did not engage "in any affirmative conduct to promote those arrangements or lull the consignors to fail to protect themselves"); <u>Multibank Nat'l of W. Mass., N.A. v. State St. Auto Sales, Inc. (In re State St. Auto Sales, Inc.)</u>, 81 B.R. 215, 220 (Bankr. D. Mass. 1988) (determining that a secured creditor was not equitably estopped from asserting its interest in consigned goods based on its actual knowledge of the debtor's consignment arrangements). The facts of the <u>State Street</u> case are distinguishable from this case because the consignment arrangement there did not preexist the bank lien, and the bank only discovered that the debtor held a few cars on consignment from its monthly inspection of its collateral.  81 B.R. at 215-16.  This is in contrast to the facts of this case, where PAC contends that the Term Loan Lenders knew at the time they extended the loan to the Debtors that PAC was consigning goods to the Debtors and expressly acknowledged PAC's priority.

The Court agrees with the analysis of those cases which conclude that actual knowledge of a consignor's interest will preclude a creditor from arguing that the consignor's interests are inferior to its interests.  It truly would be absurd to bind a secured creditor to the constructive notice of a consignor's interest arising from a UCC-1 filing or from the fact that the debtor is "generally known" to be selling consigned goods but not

bind a creditor who has <u>actual</u> knowledge of the consignor's interest in the goods when lending to the debtor.

The UCC is to be liberally construed to promote its underlying purposes. <u>See</u> Del. Code Ann. tit. 6, § 1-102(1). The purpose underlying the UCC provisions with respect to priority of consignment interests is to protect other creditors from hidden liens. <u>See</u> Official Comments to former § 2-326 - the predecessor to § 9-102(a)(20) - cmt. 3 ("The purpose of [the exception] is merely to limit the effect of the present subsection itself . . . to cases in which creditors of the buyer may reasonably be deemed to have been misled by the secret reservation."). If the Term Loan Lenders had actual knowledge of PAC's consignment interests at the time the Term Loan was granted, they could not have been misled by any "hidden" lien. Requiring PAC to give them "constructive" notice, when they already had actual notice, would be to elevate form over substance and would not serve the purposes of the UCC.

Therefore, the Court concludes that if the Term Loan Lenders knew PAC was a consignor of goods to the Debtors at the time they extended a loan to the Debtors, it would be absurd to conclude that PAC had to give constructive notice to them by filing a UCC continuation form.

### 4.   The Term Loan Lenders' Actual Knowledge

PAC contends that the Term Loan Lenders had actual knowledge

of its consignment arrangement with the Debtors at the time they

lent to the Debtors.   This is evidenced, it contends, by the very

language of the Term Loan Credit Agreement Amended and Restated

as of November 16, 2010.   Section 7.01 of the Credit Agreement

provides that the Debtors would not:

> 7.01.     Liens.   Create, incur, assume or suffer to
> exist any Lien upon any of its property, other than the
> following Liens (Liens described below are herein
> referred to as "Permitted Liens"):
>                         . . .
>    (b)  Liens existing on the date hereof and listed
>    on Schedule 7.01(b) . . . .
>
> 7.02.     Indebtedness.   Create, incur, assume,
> guarantee, suffer to exist or otherwise become liable
> with respect to any Indebtedness, except (Indebtedness
> described below is herein referred to as "Permitted
> Indebtedness"):
>                         . . .
>    (h)  Indebtedness in respect of  . . . purchase
>    money obligations to finance the acquisition of
>    assets within the limitations set forth in Section
>    7.01(i) . . .; provided, however, that the
>    aggregate amount of all such Indebtedness at any
>    one time outstanding shall not exceed $40.0
>    million . . . .

(McNeill Decl. Ex. D., Adv. D.I. 98-4.)   PAC was listed as a

Permitted Lien on that Schedule of the Credit Agreement.   (Id. at

Schedule 7.01(b).)   WSFS' 30(b)(6) witness acknowledged that "as

of the time the credit agreement was entered, Bank of America and

all the other parties to the credit agreement were on notice that

[PAC] was a secured party with regard to its consignment

inventory."   (Healy Dep. 98:18-24, Jan. 17, 2018, Adv. D.I. 98-

2.)

WSFS argues nonetheless that this was not <u>actual</u> knowledge but only <u>constructive</u> knowledge.  It argues that Schedule 7.01 merely gave constructive notice of those parties (including PAC) who had filed UCC-1 financing statements.  It contends that there is no evidence that either BOA or it had any communications with the Debtors regarding its consignment program generally or PAC's consignment relationship in particular.  (<u>Id.</u> at 49:18-51:7, 67:18-69:25.)  It also notes that in the Security Agreement, the Debtors represented and warranted that they did not have any property on consignment except for "an immaterial portion of total inventory for sale."  (McNeill Decl. Ex. E at 32-33, Adv. D.I. 98-5.)  Finally, WSFS asserts that even if the Collateral Agent had obtained actual knowledge of PAC's consignment arrangement, the Term Loan Lenders did not have any such knowledge because neither the Credit Agreement nor the Security Agreement required the Agents to forward that information to them and there is no evidence that they did so.

The Court rejects the latter assertion because the knowledge of an agent is imputed to the principal.  See <u>Meisel v. Grunberg</u>, 651 F. Supp. 2d 98, 110 (S.D.N.Y. 2009) ("Knowledge acquired by an agent acting within the scope of its agency is imputed to the principal.")  It was clearly within the scope of the Collateral Agent's duties to ascertain what other liens existed on property that it was taking as security for the Term Loan.  Under section

16

9.01(b) of the Credit Agreement, "each of the Lenders . . .

hereby irrevocably appoints and authorizes the Administrative

Agent to act as the agent of such Lender for purposes of

acquiring, holding and enforcing any and all Liens on collateral

granted by any of the Loan Parties to secure any of the

Obligations. . . ."  (Orenstein Decl. Ex. D at 97, Adv. D.I. 93-

1.)

Even if that knowledge could not be imputed from the Agent

to the Term Loan Lenders, parties to a contract are conclusively

presumed to know its contents and are bound by its terms.  Level

Export Corp. v. Wolz, Aiken & Co., 111 N.E.2d 218, 221 (N.Y.

1953) ("He who signs or accepts a written contract, in the

absence of fraud or other wrongful act on the part of another

contracting party, is conclusively presumed to know its contents

and to assent to them.") (citations omitted).  The Term Loan

Lenders are parties to the Credit Agreement and, therefore, are

charged with knowledge of its terms.  (McNeill Decl. Ex. D, Adv.

D.I. 98-4.)  Schedule 7.01(b) of that Agreement provided them

with actual knowledge that PAC had a permitted lien for

"Inventory (consigned)."  (Id. at 208.)

Nor does the Court accept the argument that the information

was just constructive knowledge of PAC's security interest under

the UCC and that the expiration of PAC's UCC-1 financing

statement somehow caused that information to be lost.  Schedule

17

7.01(b) expressly noted PAC's "consignment" interest in the

inventory.  (Id.)

     In an analogous situation, the First Circuit held that a

bank - which acquired a security interest after (and with notice

of) a security interest filed by a vendor holding a purchase

money security interest in goods it sold to the debtor - had

actual knowledge of that interest which precluded it from

asserting priority over the vendor's interest even after the

vendor's lien became unperfected.  See, e.g., In re Halmar

Distrib., Inc., 968 F.2d 121, 122-23 (1st Cir. 1992).  In Halmar,

after the vendor and then the bank obtained security interests in

the debtor's inventory, the debtor moved.  The vendor failed to

file a UCC-1 financing statement in the new location.  Id. at

122.  Notwithstanding the provision of the UCC that the vendor's

security interest became unperfected at the end of four months,

the First Circuit held that the vendor's lien continued to have

priority over the bank's lien because the bank had actual

knowledge of the vendor's lien.  Id. at 126.  In so holding the

First Circuit stated that because "the bank knew about [the

vendor's] interest from the inception of its revolving credit

arrangement . . . .  [a]dditional notice to the bank in the form

of refiling within the four-month period was as unnecessary and

useless an act as can be imagined."[6]   Id.

Thus, the Court concludes that because the Term Loan Agent
(and Lenders) actually knew of PAC's interest in the consigned
goods at the time the Term Loan was extended, the UCC does not
determine their relative priority and the rights of the consignor
are paramount.   See, e.g., GBS Meat, 474 F. Supp. at 1363
(finding that "where a secured creditor knows that the proceeds
rightfully belong to a consignor, the consignor must have
priority"); Key Book, 103 B.R. at 43 (concluding that "where a
secured creditor knows that goods rightfully belong to a
consignor . . . the consigned goods are not subject to that
creditor's lien"); Fariba, 178 Cal. App. 4th at 167 (holding that
"where a creditor has actual knowledge the consignee is
substantially engaged in the sale of property belonging to
others, the creditor's security interest does not have priority
over the consignor's"); Eurpac, 37 P.3d at 450-511 (affirming
decision that a creditor who has actual knowledge of consigned
goods does not have priority in those goods over the consignor);
Belmont Int'l, 831 P.2d at 19 (holding that if the bank knew of

---

[6]   Cf. Gen. Elec. Credit Corp. v. Nardulli & Sons, Inc.,
836 F.2d 184, 190 (3d Cir. 1988) (preserving vendors' liens vis-
a-vis the debtor who had knowledge of those liens even though
vendors failed to file new UCC-1s when the debtor moved to
another state, noting that the intended purpose of the UCC is "to
protect subsequent creditors and/or purchasers of the collateral
who otherwise cannot determine whether the collateral is subject
to the interests of a third party") (emphasis added).

the consignment, it could not have taken a security interest in those goods).

Therefore, the Court concludes that PAC's interest in the goods it consigned to the Debtors is superior to the blanket interests of the Term Loan Lenders in the Debtors' inventory.

IV.   CONCLUSION

For the foregoing reasons, the Court will grant PAC's Motion for Summary Judgment and deny WSFS's Motion for Summary Judgment.

An appropriate Order is attached.

Dated: November 26, 2018                    BY THE COURT:

Mary F. Walrath
United States Bankruptcy Judge